UNITED STATES of America ex rel.
Ralph SPERO, Petitioner,

v.

Hon. Charles McKENDRICK (Successor
to Hon. Walter M. Wallack), Warden
of Wallkill Prison, Wallkill, New York,
Respondent.

No. 66 Civ. 3033.

United States District Court
S. D. New York.

March 28, 1967.

Anthony F. Marra, New York City, Legal Aid Society, by Joshua N. Koplovitz, and Malvine Nathanson, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, by Barry Mahoney and Amy Juviler, Asst. Attys. Gen., for respondent.

## OPINION

TYLER, District Judge.

Ralph Spero and Salvatore Scarpa were convicted in the Kings County Court in March, 1961 of the crimes of robbery in the first degree, grand larceny in the first degree, assault in the second degree and kidnapping. Spero was sentenced on June 12, 1961 to a term of 10 to 20 years on the robbery conviction. Sentences on the other counts were suspended. He now petitions this court for a writ of habeas cor-

pus, alleging that evidence obtained in violation of his Fourth Amendment rights was wrongfully used against him at the trial.

At trial no constitutional objections were made to the introduction of the now challenged evidence; and, although Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), was decided one week after he was sentenced, Spero never raised the search and seizure issue on direct appeal.[1]

Spero has made two previous habeas corpus applications to this court. Because the search and seizure issue had not been fully litigated in the state courts, his applications were denied.[2] His subsequent motion for a writ of error coram nobis and his appeal therefrom were rejected by the state courts, as was his application for leave to appeal to the Court of Appeals;[3] he has thus exhausted his state remedies with respect to the search and seizure claim, and his petition is properly before this court.

Because of a lack of certainty engendered by my reading of the state record as to the facts and circumstances under which two police officers stopped Spero's car on October 7, 1959, at a time when it was being driven by two friends, Scarpa and Hugh McIntosh, an evidentiary hearing was held on January 25 and 26, 1967. Rulings on various legal points raised by the Attorney General of the State of New York were deferred pending completion of the hearing, on the basis of which the facts hereinafter recited are found.[4]

During the summer and fall of 1959, the Brooklyn South Burglary Squad, New York City Police Department, in connection with the Federal Bureau of Investigation, was investigating hijacking activities in the Borough of Brooklyn. It was known that a particular group of men (the "Persico group") which "hung out" in the vicinity of Union and Bond Streets, in particular at Russo's Bar and Grill and the El Fay Social Club, was involved in the hijacking operation; consequently, the inquiry had centered on its members. Among others, Hugh McIntosh and Salvatore Scarpa were known to be members of that group.

On September 30, 1959, after one Eddie Wallace had been interviewed regarding the hijacking of his employer's truck containing a quantity of Italian cheese and tomato paste, an "unusual occurrences" report was circulated describing, among other things, the two persons who had held Wallace captive and the car used in the hijacking. This report identifying a 1952 or 1953 two-tone green Buick two door sedan and containing the further information that one of the men had worn dark glasses, a blue striped "be-bop" style cap and a maroon corduroy jacket was read by Detectives Charles Bartels and Joseph McNeely, both members of the Brooklyn South Burglary Squad.

On October 7, 1959 members of that Squad were called upon to assist in solving the shooting of Anthony Brandofino, also known to the police as Tony Lapp. Specifically, they were called in because of their knowledge, acquired in the hijacking investigation, of the movements of Brandofino and of the members of the Persico group.

At approximately 2:15 a. m. on October 7, 1959, Anthony Brandofino received

1. Co-defendant Scarpa did raise the issue on appeal. One sentence of Spero's brief incorporated all points raised by Scarpa where applicable.

2. United States ex rel. Spero v. Fay, 63 Civil 3070 (S.D.N.Y.1964) order of Judge Cannella dated February 26, 1964; United States ex rel. Spero v. Fay (S.D.N.Y. 1965) order of Judge Sugarman dated November 15, 1965.

3. People v. Spero opinion of Judge Barshay dated July 18, 1965; People v. Spero, 25 A.D.2d 882, 270 N.Y.S.2d 254 (2d Dept. 1966); leave to appeal denied June 27, 1966 by Judge Fuld.

4. The findings here also are based in part upon the state trial record.

nine bullet wounds while walking along 59th Street in Brooklyn near Fort Hamilton Parkway. He managed to escape through an alley and climb through a window into the kitchen of a ground floor apartment where the police, in response to a radio call, found him. Brandofino would not tell the police who his assailants were, stating only that he would "take care of it" himself. He was taken to Maimonides Hospital in critical condition.

Shortly after Brandofino was removed to the hospital, it was learned that John Fahy, an off-duty patrolman who lived in the neighborhood, had been awakened by the shots and had seen an old model, possibly a 1954, rust or tan colored Pontiac pull away from the scene after a man ran from the alley and entered the car. Several other men were in the car.[5] The description fitted an automobile which the police knew belonged to Hugh McIntosh. They had frequently seen McIntosh, Scarpa and other members of the Persico group riding around in it.

At daybreak that morning, a car which fitted the description given by Patrolman Fahy was found by Detectives Farrell and McCabe parked in the vicinity of Bond and Union Streets. On the seat they saw a paper bag, the contours of which indicated that it might contain a gun; on inspection, however, it was found to be empty. A check of the license plates disclosed that they had been issued to Hugh McIntosh, but for a different automobile. When taken down to view the Pontiac, Parolman Fahy stated that it was similar to the car he had seen pulling away from the scene of the shooting.

Because of the numerous shots that were fired, the number of men seen in the Pontiac and Brandofino's refusal to identify his assailants, the police deduced that the shooting was a "gangland" assault. Previous knowledge of Brandofino and the Persico group and the identification of McIntosh's car focused sus-

picion on that group—especially on Salvatore Scarpa. Scarpa was known to have had a fight with Brandofino three months previously over a girl, Antoinette DeMarzo.

At the very least, the police believed that various members of the Persico group, if they had not participated in the shooting, knew something about it. Accordingly, Sergeant Cooney, who was in charge of the Brandofino inquiry, directed that Scarpa and McIntosh and any of their associates be picked up for questioning.

In the early afternoon of October 7, Ralph Spero had loaned his car—a 1953 Buick, recently repainted—to McIntosh and Scarpa. At approximately 3:00 p.m. Bartels and McNeely, who were parked near the intersection of Flatbush and Sixth Avenue, observed McIntosh and Scarpa in Spero's car; at the same time Scarpa spotted the detectives, whom he knew, and tried to hide his face from them. The detectives approached the car with guns drawn, ordered McIntosh and Scarpa to get out and then "patted them down" for possible weapons. Bartels knew that McIntosh, who had been driving, did not have a driver's license, and when he asked who owned the car, the only answer was "Ralphie". At that time Bartels could see that there was no key in the ignition and one of the side vent windows had been broken. The detectives also noticed a rust colored corduroy jacket lying on the back seat of the car. Almost instantly, McNeely, putting "two and two together", recognized it to be similar to the jacket described in the report of the September 30th hijacking. A search of the glove compartment disclosed a blue striped be-bop cap, two pairs of sunglasses and a drivers license in the name of Frank Spero. Whether this search was conducted at the intersection or five minutes later outside the police station is not clear from the record.

Since the 78th Precinct, the office of the Burglary Squad, was only half a

---

5. His description was substantially the same as that given by other residents of the neighborhood questioned by the police.

block away, and because traffic was becoming congested, Bartels entered the Spero automobile and drove with McIntosh and Scarpa to the station house. McNeely followed in his car. On the sidewalk, outside the precinct headquarters, Bartels became aware of the smell of fresh paint, and he saw black spray marks on the window.[6] The cap, the jacket and the glasses were taken into headquarters in order to check them against the unusual occurrence report.

At the 78th Precinct Bartels briefly questioned Scarpa about the car, the jacket and the shooting,[7] while McNeely rechecked the hijacking report and tried to locate Eddie Wallace and communicate with Sergeant Cooney. At approximately 6:00 p. m., the detectives were notified to bring Scarpa and McIntosh to the 70th Precinct. They were taken there in Spero's Buick.

McNeely then went to pick up Eddie Wallace. During their drive back to the 70th Precinct, Wallace told McNeely that while held by the hijackers, he had smoked a Parliament cigarette, and that after finishing his smoke, he had "field-stripped" the cigarette and placed it in a clean ashtray on the right rear side of the automobile. He also described two torn spots on the rear upholstery and a religious medallion on the dashboard. After McNeely and Wallace returned to the 70th Precinct, the car was checked; the cigarette, torn spots and medallion were found as described. A set of master keys for General Motors automobiles was also found in the trunk. The officers removed the keys, medallion, cigarette and ashtray.

At the stationhouse Wallace identified Scarpa. Both Scarpa and McIntosh were then taken back to the 78th Precinct and formally booked. Scarpa was charged

with the hijacking; McIntosh was charged with the possession of burglary tools.[8]

Repeated efforts were made to locate Ralph Spero. He, however, on or shortly after October 7, 1959, left the Brooklyn area for approximately two months; he finally surrendered at the District Attorney's office on December 14, 1959. Eddie Wallace subsequently identified him as one of the two hijackers.

### I.

The Attorney General raises three legal arguments in bar of any consideration of the merits of Spero's claim.

It is first suggested that Spero's failure to raise the search and seizure issue on his direct appeal and his subsequent failure to explain such omission raise the inference that he has deliberately bypassed his state remedies, a sufficient ground for denying the present application. See Fay v. Noia, 372 U.S. 391, 438, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

■■ First, it should be pointed out that even a finding of "deliberate bypass" does not automatically preclude habeas corpus relief; it is discretionary. Fay v. Noia, supra at 438, 83 S.Ct. 822. More important, however, there are no facts alleged here other than the omission itself which suggest that Spero's failure was a "deliberate bypass"—"an intentional relinquishment or abandonment of a known right or privilege." Fay v. Noia, supra at p. 439, 83 S.Ct. at p. 849. What is far more likely is that since Spero was not in the car at the time it was stopped by the police, he and his counsel simply did not think of the Fourth Amendment argument. Whatever the precise reasons for the failure to raise the point, there is no convincing evidence that Spero deliberately ignored

---

6. Scrapings taken that afternoon or evening, it is not clear exactly when, indicated that the car had previously been a two-tone green.

7. Scarpa denied everything; McIntosh refused to say anything until he had consulted with a lawyer.

8. McIntosh may also have been formally charged with the hijacking as well as the additional crime of consorting with known criminals. See Respondent's exhibits C and L; McIntosh at Habeas Corpus Hearing Minutes, p. 41.

the constitutional claim; thus, his petition cannot be dismissed on that ground.

It is next urged that the exclusionary rule established in Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) should not be applied in federal habeas corpus proceedings to vitiate Spero's pre-*Mapp* conviction. The Supreme Court has never specifically held that the *Mapp* rule is available to persons who were tried prior to the date of that decision but whose convictions had not yet become final. It has been established, however, without any extended discussion, that *Mapp* is to be applied to cases pending on direct appeal at the time of its rendition. See Linkletter v. Walker, 381 U.S. 618 at 622 and n. 4, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Tehan v. Shott, 382 U.S. 406 at 409 n. 3, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Johnson v. State of New Jersey, 384 U.S. 719, 732, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

Since his trial was before *Mapp*, Spero or his counsel reasonably could not have been expected to make an objection on constitutional grounds at trial; even if the evidence were illegally seized, it was properly admissible at the time. Yet Spero's failure to make a constitutional objection at the trial precluded any subsequent consideration of the search and seizure issue by the New York appellate courts. People v. Friola, 11 N.Y.2d 157, 227 N.Y.S.2d 423, 182 N.E.2d 100 (1962). It likewise precluded any consideration of the merits of his claim on *coram nobis*. People v. Spero, 25 A.D.2d 882, 270 N.Y.S.2d 254 (2d Dept. 1966). The Second Circuit has repeatedly held that a state prisoner tried before *Mapp* may raise a search and seizure claim in federal habeas corpus proceedings even though no search and seizure objection was raised at trial. United States ex rel. West v. LaVallee, 335 F.2d 230 (2d Cir. 1964), cert. denied sub nom. LaVallee v. Carafas, 381 U.S.

951, 85 S.Ct. 1798, 14 L.Ed.2d 725 (1965); United States ex rel. McCullers v. McMann, 370 F.2d 757 (2d Cir. 1967). Under the circumstances here presented, then, state procedural rules may not be invoked to defeat a federal right. See e. g. O'Connor v. State of Ohio, 385 U.S. 92, 87 S.Ct. 252, 17 L.Ed.2d 189 (1967).

Finally, the state urges that Spero has no "standing" to contest the search and seizure of his automobile. It bases its argument on language in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) to the effect that:

"In order to qualify as a person aggrieved by an unlawful search and seizure' one must have been a victim of a search and seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else." at p. 261, 80 S.Ct. at p. 731.

The state's exclusive reliance on this language in *Jones* is unjustified. The court's opinion in *Jones* did not supplant the traditional requirements of standing to challenge an illegal search and seizure; the test articulated in the language relied upon by the state was fashioned for a case in which those guidelines were inadequate. Traditionally, it has been required that one challenging a search and seizure by the police must show either an interest in the property seized or a substantial possessory interest in the premises searched. See Jones v. United States, supra at p. 261, 80 S.Ct. 725. In the instant case, the car as a practical matter "belonged to" Spero. Thus, whether the car is viewed as "premises searched" or as "property seized", his possession of the car which he had temporarily loaned to two friends is sufficient to confer standing.[9] See United States v. Eldridge, 302 F.2d 463 (4th Cir. 1962).

---

9. The state has emphasized a number of facts from which one might infer that Spero had no legitimate possessory interest in the Buick. See e. g. Williams v. United States, 323 F.2d 90, 94–95 (10th Cir. 1963). While I am not at all convinced that the inference would defeat "standing", it would be most inappropri-

## II.

As is often the case when dealing with automobiles, the sequence of events beginning at Flatbush Avenue on the afternoon of October 7, 1959 does not lend itself to the usual rubric of "seizure incident to a lawful arrest". As I view the circumstances of this case, an evaluation of whether or not the search and seizure of Spero's car was unreasonable in the Fourth Amendment sense can only be made by scrutinizing the total picture as it unfolded in the eyes of the police officers, the inferences drawn by the latter and the actions taken by them. See generally Cooper v. State of California, 386 U.S. ——, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

 In examining the circumstances surrounding the stopping of Spero's car and the subsequent arrest of Scarpa and McIntosh, it is difficult to pinpoint the precise moment at which an "arrest" occurred. It is abundantly clear, however, that there was no arrest at the time the car was initially stopped on the corner of Flatbush and Sixth Avenues. The police thought that both Scarpa and McIntosh had been involved in the Brandofino shooting; they stopped the car intending only to bring them in for questioning about the shooting. An arrest requires an intent on the part of the arresting officer to bring a person into custody to answer for a crime charged. N.Y.Code of Criminal Procedure § 167; see also United States v. Bonnano, 180 F.Supp. 71, 77 (S.D.N.Y. 1960) rev'd on other grounds sub nom. United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960). That the police approached the car with guns drawn and frisked both Scarpa and McIntosh after ordering them out of the car does not transform the investigation into an arrest. A shooting had taken place but a few hours before, and the policemen were well acquainted with the reputations and the previous records of both men. Under

such circumstances, it would have been foolish to forego such precautions.

 Counsel for Spero have not suggested that it is unreasonable and illegal for police officers to stop and question an individual unless they have "probable cause" for a formal arrest. Such a proposition would unnecessarily restrict police investigation; indeed, allowance for a reasonable period of detention protects those who can readily clear themselves from being formally charged before their explanations are considered. See United States v. Vita, 294 F.2d 524, 529–531 (2d Cir. 1961) ; see also United States v. Bonnano, supra, in which the police officers merely suspected that a crime had occurred. Where, as here, the police knew that a shooting had taken place and reasonably believed that Scarpa and McIntosh had been involved or, at the very least, possessed information about the shooting, it was proper to stop and detain them for questioning.

 It was likewise reasonable to require that Scarpa and McIntosh accompany the two detectives to the police headquarters half a block away. In addition to the obvious fact that an investigation of this sort would, at best, be awkward on the busy corner of Flatbush and Sixth, traffic was becoming congested and a crowd was beginning to gather. Equally important, it was in the course of the confrontation at the intersection that McNeely and then Bartels first noticed the corduroy jacket. The officers did not "search" for the jacket; it was lying on the back seat where anyone glancing through the window could see it. A search suggests looking into hidden places for objects which may be concealed from general view. See United States v. Bhono, 256 F.Supp. 391 (S.D. N.Y.1966). True, the ordinary passerby would have thought nothing of the jacket. McNeely and Bartels, however, had been investigating hijackings in the Brooklyn area for some months. It was their job

---

ate for me to conclude here that the car was stolen. As for the suggestion that Spero has no standing because he in effect "abandoned" his car, the totality of

the circumstances suggests that the supposed "abandonment" was in fact entirely consistent with a substantial possessory interest.

to familiarize themselves with reports of recent hijackings, and to be on the lookout for cars, persons, clothes or whatever else related to information in the reports. The hijacking had occurred only a week before; thus, when McNeely saw the jacket, he immediately related it to the hijacking. Under such circumstances, further questioning and identification checking at a nearby police station were plainly called for.[9a]

■ Turning to the "seizure" of the car and the various items therein, it is also difficult to pinpoint the moment at which a seizure can be said to have occurred. Certainly, the initial stopping of the car cannot be deemed a seizure. Automobile drivers are often stopped by policemen; occasionally they may even be taken to the police station. None would say that his car had been seized. Before there can be a seizure, the police officers must intend to take something for the purpose of charging and prosecuting a criminal offense.

■ As I appraise the events after Scarpa and McIntosh were removed from the Spero automobile at Flatbush and Sixth, the police formed such intention at the headquarters of the 78th Precinct. Once they had confirmed there that the cap, glasses, jacket and, indeed, the automobile itself were those described in the hijacking reports, they effectively seized the car and its contents. At this point in time, which was not long after the officers and Scarpa and McIntosh arrived at precinct headquarters, it became clear that the car would not be relinquished to Scarpa or McIntosh, or to Ralph Spero if he could be found.

■ Parenthetically, it should be noted that counsel for Spero have characterized the later examination of the car with Eddie Wallace after he had been driven to precinct headquarters as an entirely separate search and seizure. Confessing my inability to see any com-

pelling legal distinction here, I conceive of this later examination as essentially nothing more than a verifying identification of things which had already been seized. It was, of course, a closer and more compelling inspection because Wallace had been held in the car by the hijackers. He, however, merely confirmed what the police already had reasonable cause to believe—i. e. that Spero's Buick was the hijacking car.

■ Spero argues further that however the events of the afternoon and evening of October 7 are analyzed, there was ample time and opportunity for the police to have obtained a warrant for the later search of the Buick. This is not a persuasive argument here; "the relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable." United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 94 L.Ed. 653 (1950); see generally Cooper v. State of California, supra.

■ Finally, counsel for Spero have asserted that some of the items seized—the jacket, cap, sunglasses, religious medal, ashtray and cigarette—were merely evidentiary materials as opposed to the instrumentalities and means by which a crime is committed. Relying upon language of the majority opinion in Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), counsel suggest that the seizure of these items, considered as evidentiary only, was constitutionally impermissible. The simple answer to this contention is that the Buick and the other relevant items found therein were properly regarded as instrumentalities of the crime of hijacking for which Spero was charged and convicted. They were used in the commission of the offense—i. e. the jacket, cap, sunglasses, medal, ashtray and cigarette were part and parcel of the automobile used to commit the offense, and it would

---

**9a.** As I appraise the situation, the search of the glove compartment was part of the "patting down" for weapons which, in the circumstances of this case, was both prudent and necessary.

be unrealistic to segregate them from the car in the factual context of this case.[10]

The petition is denied. It is so ordered.

---

10. It perhaps should be observed that since McIntosh, Scarpa and Spero at all times denied ever having seen any of these items —i. e. they denied ownership—this issue is totally contrived and academic.