409 F.2d 181
 UNITED STATES of America ex rel. Ralph SPERO, Petitioner-Appellant,
v.
Hon. Charles McKENDRICK (Successor to Hon. Walter M. Wallack), Warden of Wallkill Prison, Wallkill, New York, Respondent-Appellee.
 No. 439.
 Docket 31605.
 United States Court of Appeals Second Circuit.
 Submitted March 13, 1969.
 Decided April 15, 1969.
 
 1
 Sam Polur, New York City, for petitioner-appellant.
 
 
 2
 Brenda Soloff, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, on the brief), for respondent-appellee.
 
 
 3
 Before MOORE and FEINBERG, Circuit Judges, and McLEAN, District Judge.*
 
 McLEAN, District Judge:
 
 4
 In March 1961 petitioner Ralph Spero and Salvatore Scarpa were convicted in the County Court of Kings County of robbery in the first degree, grand larceny in the first degree, assault in the second degree, and kidnapping. All these crimes were committed in the course of a hijacking of a truck in Brooklyn on September 30, 1959. Spero was sentenced to a term of ten to twenty years on the robbery conviction. Sentence on the other counts was suspended. His conviction was affirmed by the Appellate Division (People v. Spero, 16 A.D. 2d 981, 284 N.Y.S.2d 696 (2d Dept. 1962)). The Court of Appeals of New York denied leave to appeal.
 
 
 5
 After a series of unsuccessful collateral attacks upon the judgment, both in the state and the federal court, petitioner sought the present writ of habeas corpus. Judge Tyler entertained the application, held an evidentiary hearing, wrote an extended opinion and denied the petition. Judge Tyler's opinion is reported in 266 F.Supp. 718 (1967). We agree with his conclusion and accordingly affirm the order.
 
 
 6
 Petitioner's principal contention is that evidence obtained in violation of the Fourth Amendment was used against him at the trial. The evidence, which included a partially smoked cigarette, a religious medallion, a pair of sunglasses, a corduroy jacket and a "be-bop" hat, was discovered by police officers in an automobile owned by petitioner. The officers had no search warrant. The facts leading up to their discovery may be briefly summarized.
 
 
 7
 Wallace, the driver of the truck at the time of the hijacking, informed the police that one of the two men who had held him up wore dark glasses, a rust-colored corduroy jacket, and a be-bop hat. Wallace also said that the hijackers drove a 1952 or 1953 Buick which was painted a two-tone green. A report of Wallace's information was circulated through several police precincts.
 
 
 8
 A few days after the hijacking, Anthony Brandofino, known to the police as an underworld figure, was shot some nine times on a Brooklyn street. Although he lived to tell the tale, he refused to tell it. The police suspected, for various reasons, members of the Persico gang, particularly Hugh McIntosh and Salvatore Scarpa. Suspicion centered on McIntosh because he was thought to own an automobile which resembled one observed at the scene of the shooting, and on Scarpa, because he was known to have had an altercation with Brandofino over a woman. Consequently, instructions were sent out to pick up McIntosh and Scarpa for questioning.
 
 
 9
 At approximately 3:00 P.M. on October 7, 1959, officers Bartels and McNeely observed McIntosh and Scarpa sitting in a black 1953 Buick at the corner of Flatbush and Sixth Avenues, Brooklyn. The officers ordered the two men out of the car and "patted them down" for weapons. Looking into the automobile from the sidewalk, the officers observed a rust-colored corduroy jacket lying on the back seat. No search was required to discover it, for it was in plain sight. It fitted the description of the jacket worn by one of the hijackers. Asked who owned the automobile, McIntosh answered "Ralphie."
 
 
 10
 A crowd of interested onlookers began to gather and traffic was becoming obstructed. The officers considered it advisable under the circumstances to transfer the scene of the inquiry to the 78th Precinct station house which was only half a block away. Accordingly, officer Bartels drove the Buick with McIntosh and Scarpa as passengers to the station house. McNeely followed in the police car.
 
 
 11
 While standing on the sidewalk in front of the precinct headquarters, Bartels smelled fresh paint. He observed black paint spray marks on the window of the Buick. He concluded that the car had been freshly repainted. Either then or shortly thereafter, precisely when does not appear, the police scraped some of the paint from the automobile and discovered that the car had previously been a two-tone green.
 
 
 12
 Either when the automobile was parked on Flatbush Avenue or a few moments later when it arrived at the station house (again the record is not clear as to the exact moment), Bartels and McNeely looked in the glove compartment of the vehicle and discovered two pairs of sunglasses, a be-bop hat and a driver's license in the name of Frank Spero.
 
 
 13
 McIntosh and Scarpa and the automobile were held at the 78th Precinct station house until approximately 6:00 P.M. The police then took the two men and the vehicle to the 70th Precinct station house several miles away. Meanwhile, McNeely went out to find Wallace, the hijacking victim. He found him early in the evening and brought him to the 70th Precinct headquarters. Wallace looked through a one-way mirror while Scarpa was standing in a three-man lineup. Wallace identified him as one of the hijackers.
 
 
 14
 Wallace told the police on his way to the station house that while he was held captive by the hijackers in the Buick, he had observed certain things about the car, i. e., two tears in the rear upholstery and a religious medallion on the dashboard. He also related that he had put the remains of a Parliament cigarette in the rear ashtray. Armed with this information, McNeely examined the automobile when he arrived at the 70th Precinct headquarters. He found that it tallied exactly with Wallace's description of the holdup vehicle right down to the remains of the Parliament cigarette in the ashtray.
 
 
 15
 At this point Scarpa and McIntosh were formally booked. It was then late in the evening of October 7. Scarpa was charged with the hijacking. Efforts to locate petitioner Spero were unavailing. He eventually surrendered some two months later. After his surrender, Wallace identified him as the other hijacker.
 
 
 16
 Judge Tyler upheld petitioner's standing to question the constitutionality of the search of his automobile, even though petitioner was not in it at the time. Having done so, Judge Tyler held that the search was reasonable. We are satisfied that it was.
 
 
 17
 The police had reasonable cause to stop Scarpa and McIntosh for questioning about the attack on Brandofino. Knowing their reputations and propensities, it was eminently reasonable of the officers to search Scarpa and McIntosh for weapons. It was also reasonable and proper under the circumstances to take Scarpa and McIntosh to the 78th Precinct headquarters half a block away rather than to block traffic and attract a crowd at the street intersection. The events at the street corner and those which occurred a few moments later in front of the station house were all part of the same transaction.
 
 
 18
 Discovery of the corduroy jacket, a discovery accomplished without a search, gave the police reasonable grounds to believe that the car might be connected with the hijacking. Discovery of the fact that the car had been recently repainted and had formerly been a two-tone green materially strengthened that probability. Under the circumstances it was reasonable to search the glove compartment. We think it immaterial whether this was done at the street corner or a few minutes later in front of the station house.
 
 
 19
 As a practical matter Scarpa and McIntosh were arrested and the car was seized when all three were detained at the 78th Precinct, even though Scarpa and McIntosh were not formally booked until after Wallace had been located and brought in. The police had probable cause to arrest Scarpa and McIntosh and the search can fairly be said to be incident to that lawful arrest. The fact that some of the articles discovered by the search incriminated petitioner as well as Scarpa is merely petitioner's misfortune. It did not violate his Fourth Amendment rights.
 
 
 20
 The discovery later that night of the ashtray and the religious medallion, a discovery which made it practically conclusive that the Buick was indeed the hijacking car, was not an unreasonable or an unlawful search. It was merely an inspection by the police of a vehicle which had already been lawfully seized. Petitioner's reliance upon Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) is misplaced. The case is clearly distinguishable on its facts.
 
 
 21
 Finally, Judge Tyler properly held as to most of the articles seized that they constituted the instrumentalities of crime. Although this holding may be doubtful with respect to the cigarette ashes and the medallion, these articles were clearly types of evidence of a non-"testimonial" nature which may be properly obtained by an otherwise lawful search. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).
 
 
 22
 We have considered petitioner's other contentions, including his claim that his rights were violated by an allegedly unconstitutional identification by Wallace, not of petitioner, but of Scarpa. We find these points to be without merit.
 
 
 23
 The order is affirmed.
 
 
 
 Notes:
 
 
 *
 Of the Southern District of New York, sitting by designation