UNITED STATES of America

v.

Leroy BARNES, a/k/a "Nicky," and Guy
Fisher, a/k/a "Radio," Defendants.

No. (S) 77 Cr. 190 (HFW).

United States District Court,
S. D. New York.

Nov. 7, 1977.

Robert B. Fiske, Jr., U. S. Atty., New York City by Thomas H. Sear, Robert B. Mazur, Denise L. Cote, Asst. U. S. Attys., New York City, for the Government.

Goldberger, Feldman & Breitbart, New York City by Michael Young, New York City, for defendants Fisher & Barnes.

## OPINION

WERKER, District Judge.

Defendants Leroy Barnes and Guy Fisher have each moved to suppress evidence seized from them following searches undertaken without warrants by members of the New York City Police Department. Barnes seeks to suppress more than $130,000 seized from the trunk of his automobile when he was arrested on December 17, 1974; Fisher seeks to suppress a driver's license and approximately $103,000 seized from the trunk of his automobile when he was arrested on September 30, 1974. Both defendants contend that the seizures, and the events leading up to them, cannot be justified under the Fourth Amendment to the United States Constitution.

The admissibility of the evidence seized from the defendants has previously been litigated in suppression hearings held prior to the trial of each defendant on unrelated state court charges.[1] The Honorable Joseph P. Sullivan, Justice of the New York State Supreme Court, denied Barnes' motion to suppress on March 25, 1975 after hearing four days of testimony from witnesses for the People and Barnes and extensive argument by counsel; and the Honorable Leon Polsky, Justice of the Supreme Court of the State of New York, denied Fisher's suppression motion on January 26, 1976 after a two-day hearing. Both defendants were represented at the state court suppression hearings by David Breitbart, Esq., who is also counsel for Barnes in this proceeding. Another member of Mr. Breitbart's firm, Paul Goldberger, Esq., presently represents Fisher.

## I

■ Although the government has the initial burden of establishing the validity of the warrantless searches and seizures challenged by the defendants, see *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951); 3 C. Wright, Federal Practice & Procedure § 675, at 127 (1969), it can make a *prima facie* showing by placing copies of the state court hearing record before this court.[2] These records are tech- nically hearsay, of course, but for pretrial purposes the court is "not bound by the rules of evidence" concerning matters other than privileges, Fed.R.Evid. 104(a), and I am therefore "empowered to hear any relevant evidence, such as affidavits or other reliable hearsay." Advisory Comm. Note on Proposed Rule 104(a).

I find that the testimony in state court, having been given under oath and subject to cross-examination, more than meets the requisite indicia of reliability. Moreover, given the inadequacy of the defendants' offer of proof with respect to the searches, I hold that the state court transcripts conclusively establish the government's right to introduce at trial evidence obtained through the contested searches and seizures.[3] My findings of fact and conclusions of law with respect to each defendant follow:

## II. BARNES

*a. Factual Findings:* The 48th Precinct in the Bronx is situated in a high crime area (B237).[4] At approximately 1:00 a. m. on December 17, 1974, police officers Paul Von Werne and Daniel Duffy were on motor patrol of Sector A of that precinct when they noticed three unattended late-model Mercedes Benzes parked in a row on 175th Street near Southern Boulevard (B85–88). As the officers drove by, Von Werne no-

---

1. Barnes was acquitted after trial on a bribery charge growing out of events occurring after the discovery of the money in the trunk of his car. Fisher was similarly tried on charges of criminal impersonation and bribery which arose out of the search of his vehicle. After conviction on the criminal impersonation count, Fisher was sentenced to one year in jail and his conviction and sentence were affirmed on appeal. *People v. Fisher*, 53 A.D.2d 816, 385 N.Y.S.2d 693 (1st Dep't), *leave to appeal denied*, 39 N.Y.2d 1059, 387 N.Y.S.2d 1036, 355 N.E.2d 390 (1976).

2. Although the records presented to the court are neither certified as correct nor sworn to be correct by a witness who has compared them with the originals, see Rule 1005, Fed.R.Evid., no issue has been raised as to their authenticity and there is consequently no reason not to admit them. Rule 1003, Fed.R.Evid.

3. The defendants' affidavits consist of legal conclusions and factual allegations which would not entitle them to suppression of the evidence even if they were to be accepted at face value. For this reason, counsel were given an additional opportunity to make an offer of proof in open court. Only Mr. Breitbart availed himself of that opportunity and none of the evidence which he outlined raised any material issue of fact. Indeed, much of it would not have been admissible. Under these circumstances, the court did not consider it necessary to hold hearings on the defendants' motions to suppress. *See United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969), *cert. denied*, 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970); 3 C. Wright, Federal Practice & Procedure § 675 (1969).

4. Parenthetical citations preceded by a "B" refer to the transcript of the hearing held before Justice Sullivan in March of 1976.

ticed that the two rear cars had New Jersey license plates, but could not see where the first car (which had no front license plate) was registered. (B87, 89). Since the cars were actually parked in Sector B of the precinct, which is the adjoining patrol area, Von Werne and Duffy drove around the block and placed a 1:02 a. m. radio call for a "1085" (a rendezvous) with police officers William Dunphy and William Ohrnberger, who were assigned to the Sector B patrol car (B89, 91, 160, 311). The four officers met at an agreed location and decided to run license plate checks, known as "1015's" on the three vehicles (B92, 312). Accordingly, the Sector A patrol car followed the Sector B patrol car back to the intersection of 175th Street and Southern Boulevard. As the two cars drove along 175th Street, the Sector B car slowed almost to a standstill to enable Dunphy to note the license plate numbers of the parked vehicles (B92, 365). The patrol cars then made a left turn and stopped about two blocks from 175th Street (B93, 367). At 1:10 a. m., Dunphy radioed license plate information on the two rear automobiles to the 7th Division dispatcher (B201–02, 367). He did not check on the first automobile since he, too, had been unable to see the license plate on the rear of that vehicle (B365–66). At 1:13 a. m., the dispatcher sent a "1017" message to Dunphy indicating that neither of the rear two automobiles had been reported stolen (B370). Nevertheless, before returning to their patrol duties, the officers agreed that they would keep an eye on the parked vehicles (B94, 370).

Ten or fifteen minutes later, as the Sector A patrol car was travelling along Southern Boulevard, Von Werne saw three men walking in the direction of the parked automobiles (B95). The Sector A car circled around to a location "one short block from where the cars were located," and from that position Von Werne was able to see that the first of the Mercedes Benzes had started to move (B96). As it left the curb, the Sector A patrol car followed (B97). The Mercedes stopped at an intersection for a red light and remained there even after the signal had turned green (B97). As the traffic signal was again turning red, the Mercedes moved into the intersection, pausing for a moment before making a right turn onto Southern Boulevard. After travelling for about one car length, the Mercedes made a U-turn and proceeded in the opposite direction on Southern Boulevard (B97–98). This illegal maneuver caused it to cross a double yellow line (B99).[5]

Since oncoming traffic blocked the path of the Sector A patrol car, Von Werne and Duffy did not catch up to the Mercedes until the intersection of Southern Boulevard and East Tremont Avenue, where the Mercedes turned left with the Sector A patrol car following immediately behind (B99). Dunphy, who happened to be standing near that intersection (B99–100, 313–14, 395), returned to the Sector B patrol car (B397), made a U-turn on East Tremont Avenue and joined the procession (B314). In the meantime, when the Mercedes stopped for a red light at the intersection of Marmion and East Tremont Avenues, the Sector A patrol car pulled alongside it and Von Werne told the driver to pull his car over to the curb after the light turned green (B101). Von Werne noticed at that time that the car had three male occupants—the driver and two passengers—and that all of them were Black. (B101–02, 217). When the light turned green, the driver did not move his car; indeed, a second instruction was required before the driver complied (B102).

Von Werne and Duffy stopped directly behind the Mercedes and got out of their car. By this time, the driver of the Mercedes had already left his own vehicle, and he met the officers midway (B103, 219). Von Werne asked the driver for his license and registration, and the driver—later identified as the defendant Leroy Barnes—produced a New York driver's license and a Pennsylvania registration, explaining that

---

**5.** See New York Vehicle and Traffic Law §§ 155 (McKinney 1970), 1128(d) (McKinney Supp.1976); 15 N.Y.C.R.R. 261.4(b).

the Mercedes was registered in Pennsylvania because it was leased (B103). At approximately this time, Dunphy and Ohrnberger arrived on the scene (B104–05, 314–15, 403).

Von Werne took Barnes' license and registration and returned to the Sector A patrol car. At 1:28 a. m., he radioed a "1015 on the plate and a . . . check of Barnes' driver's license to see if there were any suspensions" (B105, 162, 239). At 1:30 a. m., the 7th Division dispatcher sent Von Werne a "1017 Sprint awaiting N.C.I.C." message (B240–41). This indicated that the Mercedes had not been reported stolen in New York City, but did not establish that it had not been stolen elsewhere (B373–74). Von Werne therefore remained in his patrol car to await the dispatcher's final clearance of the driver's license and vehicle registration (B241). Duffy was also in the patrol car; Barnes and Dunphy were standing nearby (B105, 246, 403–04). While Von Werne was awaiting a further dispatch, Dunphy walked around the Mercedes. He paused near the rear of the Mercedes and saw that the two passengers still seated in it were male Blacks. Although that was about all he could see inside the car (B412–416), he did notice that Barnes seemed to be "a little nervous" at that time (B444–45).

At 1:31 a. m., a message came over the police radio. Both Von Werne and Dunphy heard part of this "radio run" which concerned a robbery at 725 Garden Street, some eight blocks from the scene (B106, 428). The part of the message that they heard was as follows:

> Okay all units in the 44; the 46 sarge is looking—the 46 sarge is looking for, from 725 Garden Street, they want three male blacks. They robbed a police officer. One is wearing a green Army jacket, armed with police officers Smith and Wesson off duty and shield (B428, 436).

Upon hearing this, Dunphy said to Von Werne, "Let's get them out of the car" (B107, 316–17, 436). Von Werne immediately got out of the patrol car and started to frisk Barnes. Duffy approached the rear driver's side of the Mercedes and Dunphy went over to the rear passenger's side. Since the rear passenger was sitting closer to the passenger side of the vehicle, Dunphy knocked on the window and said "Let's get out of the car." Dunphy opened the rear passenger side door of the Mercedes, expecting the rear passenger to alight, but the passenger unexpectedly began to slide over to the driver's side of the car (B317). As he did so, the passenger placed a revolver in a holster in the rear seat well (B318, 449, 525). Dunphy waited until the passenger had left the automobile before retrieving and examining the revolver. In a loud voice he called out, "I got a gun. Let's get them over the car" (B318–18A). Hearing the word "gun," Von Werne asked, "Billy you got a gun?" and Dunphy answered, "Yeah, I got a gun" (B108, 257, 322). Dunphy then gave the revolver to Von Werne who examined it and placed it in his pocket (B108, 322). At that time, both Von Werne and Dunphy thought that the revolver taken from the Mercedes looked like an off-duty police special (B108, 318A). Accordingly, Von Werne handcuffed Barnes (B108, 255) and Barnes and the other two occupants of the car were then placed against the gate of a nearby store. Dunphy walked to the Mercedes, removed the keys from the ignition and peered briefly underneath the front and rear seats before returning to the area where Barnes was being held (B109, 323). At that juncture, Barnes suggested that "We can do something here. We don't have to go through this" (B109, 257–57A, 323). Dunphy's answer was "Just relax" (B109, 323).

Dunphy returned to the Mercedes and opened the trunk, finding a suitcase and several bags containing stacks of money (B109, 258, 323–24). The money discovered in the trunk of the car totalled more than $130,000 when it was later counted. (B341, 346, 503).

■ *b. Conclusions of the Court:* There can be no doubt that it was proper for Von Werne and Duffy to stop the Mercedes driven by Barnes for a license and registration check. Under § 401(4) of the New York Vehicle and Traffic Law ("VTL")

(McKinney 1970), the operator of a motor vehicle must produce his registration certificate and driver's license upon a police officer's demand. Stopping a car for this purpose violates Fourth Amendment standards when done for reasons which are "gratuitous, arbitrary, and without justification or excuse," *People v. Ingle*, 36 N.Y.2d 413, 418, 369 N.Y.S.2d 67, 72, 330 N.E.2d 39, 42 (1975), *citing Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), but not when the police officer reasonably suspects that a violation of the VTL has occurred. *People v. Ingle*, 36 N.Y.2d at 414, 369 N.Y.S.2d at 69, 330 N.E.2d at 40; *People v. Holmes*, 52 A.D.2d 629, 382 N.Y.S.2d 546, 547 (2d Dep't 1976); *People v. Bovian*, 52 A.D.2d 625, 382 N.Y.S.2d 547, 548 (2d Dep't 1976). Since Von Werne and Duffy observed that the Mercedes Benz was being driven in a most curious manner during the early morning hours and in an area plagued by a high incidence of crime, and also saw Barnes commit a traffic infraction by crossing a double yellow line, it is clear that their decision to stop the Mercedes can hardly be characterized as arbitrary or without justification. *See Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. 1868; *United States v. Thomas*, 289 F.Supp. 364, 365 (S.D.N.Y. 1968); *People v. Ingle*, 36 N.Y.2d at 420, 369 N.Y.S.2d at 74, 330 N.E.2d at 44; *People v. Denti*, 44 A.D.2d 44, 46, 353 N.Y.S.2d 10, 13 (1st Dep't 1974) (cruising in circles in high crime area indicated possibility that crime was about to be committed and justified stop); *People v. Hoffman*, 24 A.D.2d 497, 498, 261 N.Y.S.2d 651, 653 (2d Dep't 1965) (suspicious operation of automobile at four o'clock in the morning warranted stop).

It was similarly reasonable for the officers to ask the remaining passengers to step out of the Mercedes after learning that three Black men had recently robbed a police officer in the area and that one of them was armed. *See Adams v. Williams*, 407 U.S. 143, 147–48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Indeed, it would have been foolhardy not to conduct a limited search for weapons once the radio report had been received. While the officers could not be

certain that the occupants of the Mercedes were in any way connected to the reported robbery, an officer, in order to conduct a frisk for weapons, "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883. Here, it is evident that such a belief was justified.

The holstered revolver was subsequently discovered while Dunphy and Duffy were removing the passengers from the Mercedes in order to search them for weapons. Since it inadvertently came into "plain view" during the course of justified intrusive conduct, Dunphy was clearly entitled to recover it from the rear seat well of the Mercedes. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (*per curiam*); *United States v. Rollins*, 522 F.2d 160, 166 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *United States ex rel. LaBelle v. LaVallee*, 517 F.2d 750, 755 (2d Cir. 1975), *cert. denied*, 423 U.S. 1062, 96 S.Ct. 803, 46 L.Ed.2d 655 (1976); *see Mapp v. Warden*, 531 F.2d 1167, 1172 (2d Cir. 1976), *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976).

Having determined that there was adequate cause to stop the Mercedes, to conduct a limited search for weapons and to recover the revolver, I now turn to the ultimate question presented by the Barnes motion to suppress: whether there was any basis for the subsequent warrantless search of the trunk of the car.

■ While the Fourth Amendment protects persons from all unreasonable searches and seizures, a host of Supreme Court decisions make it clear that a warrantless search of an automobile may be justified by a somewhat different showing of probable cause than would apply to a home or office. *E. g., United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *South Dakota v. Opper-*

*man,* 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cardwell v. Lewis,* 417 U.S. 583, 589–90, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Chambers v. Maroney,* 399 U.S. 42, 48–50, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *see Cady v. Dombrowski,* 413 U.S. 433, 439–40, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Thus, "the right to search [an automobile] and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause that the seizing officer has for belief that the contents of the automobile offend against the law." *Carroll v. United States,* 267 U.S. 132, 158–59, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925).

■ At the time that Dunphy first searched the car, the police knew that three Black men had recently robbed a police officer and had taken his off-duty revolver and shield from a location near where they had stopped the Mercedes. They had before them three Black men who had been seen driving an expensive automobile around the area in a suspicious manner, and they had already recovered what appeared to be an off-duty revolver that one of the passengers had attempted to hide while leaving the automobile. Moreover, it was apparent to them that Barnes was rather nervous. Given this, Barnes' initial failure to pull his car to the curb as instructed and the rear passenger's strident denials that he had any "gun," it was not unreasonable for the officers to conclude that they had located the Garden Street robbers and that a search of the automobile would yield either the missing shield or the green Army jacket reportedly worn by one of the trio. Under these circumstances, I consider it reasonable for Dunphy to have made a cursory search of the passenger compartment of the vehicle. I furthermore think that the search of the trunk was justified once Barnes cast additional suspicion upon himself by proposing some sort of arrangement to Dunphy. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227–28 & n. 10, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Chambers v. Maroney,* 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Tramunti,* 513 F.2d 1087, 1100–05 (2d Cir.), *cert. denied,*

423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Soriano,* 497 F.2d 147, 149–50 (5th Cir. 1974) (*en banc*), *reaffirmed sub nom. United States v. Aviles,* 535 F.2d 658 (1976), *cert. pending,* Nos. 76–5132 and 76–5143.

Although I do not rest my decision on this ground, I also believe that the seizure of money from Barnes' automobile may be upheld as the product of a search incident to a lawful arrest. *See United States v. Soriano,* 497 F.2d at 150.

■ The legality of Barnes' arrest by New York City police officers must be determined in the first instance by reference to the law of New York State. *Ker v. California,* 374 U.S. 23, 37, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States ex rel. LaBelle v. LaVallee,* 517 F.2d 750, 753 (2d Cir. 1975), *cert. denied,* 423 U.S. 1062, 96 S.Ct. 803, 46 L.Ed.2d 655 (1976). Under § 140.10(1)(b) of the New York Criminal Procedure Law (McKinney 1971), a police officer may arrest a person for a crime "when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." Since reasonable cause under § 140.10(1)(b) is the same as probable cause under the United States Constitution, *People v. Fields,* 50 A.D.2d 870, 376 N.Y.S.2d 943 (2d Dep't 1975); *see United States ex rel. Gonzales v. Follette,* 397 F.2d 232, 234 (2d Cir. 1968), an officer may effect an arrest when he has knowledge of facts and circumstances sufficient to warrant a prudent man in believing that an offense is being or has been committed. *Carroll v. United States,* 267 U.S. at 161, 45 S.Ct. 280; *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *United States v. Edmonds,* 535 F.2d 714, 719 (2d Cir. 1976). It does not matter whether the arrest is ultimately found justified, for before making an arrest the police need not conduct a trial, *Morrison v. United States,* 491 F.2d 344, 346 (8th Cir. 1974); *Lathers v. United States,* 396 F.2d 524, 532 (5th Cir. 1968), or assemble evidence sufficient to establish guilt. *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct.

168, 4 L.Ed.2d 134 (1959); *United States v. Chaplin*, 427 F.2d 14, 15 (2d Cir.), *cert. denied*, 400 U.S. 830, 91 S.Ct. 59, 27 L.Ed.2d 60 (1970). The thoughts and actions of the police officers are not, in other words, to be judged with the "full clarity of hindsight." *United States v. Tramunti*, 377 F.Supp. 1, 5 (S.D.N.Y.1974), *aff'd*, 513 F.2d 1087 (2d Cir. 1975).

Logically, in order to determine whether Von Werne had probable cause to arrest Barnes, and therefore whether Dunphy had probable cause to search the Mercedes, one must first inquire as to when the arrest of Barnes occurred. *See Sibron v. New York*, 392 U.S. 40, 67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Rios v. United States*, 364 U.S. 253, 261–62, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). An arrest is not effected merely by stopping and frisking a person. *See United States ex rel. Griffin v. Vincent*, 359 F.Supp. 1072, 1075–76 (S.D.N.Y.1973); *United States ex rel. Spero v. McKendrick*, 266 F.Supp. 718, 724 (S.D.N.Y. 1967), *aff'd*, 409 F.2d 181 (2d Cir. 1969). Rather, there must be an "actual or constructive seizure or detention" which is meant to be an arrest of the person and which would cause a reasonable man, innocent of any crime, to believe that he had been arrested. *See Hicks v. United States*, 127 U.S.App.D.C. 209, 382 F.2d 158, 161 (1967) (Burger, J.), *quoting Jenkins v. United States*, 161 F.2d 99, 101 (10th Cir. 1947); *see also United States v. Thomas*, 250 F.Supp. 771, 781 (S.D.N.Y.1966), *aff'd*, 396 F.2d 310 (1968); *United States v. Bonanno*, 180 F.Supp. 71, 78 (S.D.N.Y.1960) (Kaufman, J.), *rev'd on other grounds sub nom. United States v. Buffalino*, 285 F.2d 408 (1960). Under this standard, I conclude that Barnes was not arrested until he was handcuffed by Von Werne. At that moment, the police knew of every factual element noted in my earlier discussion of prob-

able cause to search the trunk of the automobile for evidence of the crime of robbery with the exception of the statements that Barnes and the rear seat passenger later made to deny knowledge of the gun. I hold that this information gave them probable cause to arrest Barnes and his cohorts—if not for possession of a firearm, then for committing the Garden Street robbery. Moreover, since the arrest was justifiable, the police were entitled to conduct the search. No further justification (such as a belief that the officers' search would lead to the recovery of weapons or evidence) is necessary. *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 265–66, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

## III. FISHER

*a. Factual Findings:* Detective William Casey and Police Officer Walter Puhalski are assigned to the New York City Police Department Auto Crime Unit. (F34, 261).[6] At approximately 3:30 p. m. on September 30, 1974, they had just completed a routine stop[7] of an automobile on Houston Street and were entering their marked police vehicle when they noticed that a passing automobile, a blue 1972 "Chevy," was moving from lane to lane without signalling and at a rate of speed in excess of the flow of traffic (F44–45, 136, 262–63, 265). The officers decided to stop the driver of the car for a "routine" license and registration check and pulled him over to the curb west of the intersection of Houston Street and the Bowery (F45–46, 96–97, 262, 268). In response to Casey's request, the driver of the car, later identified as the defendant Guy Fisher, produced a driver's license in the name of Waymin Hines[8] and a vehicle registration in the name of Denise Betts (F46). Fisher told Casey that the owner of the vehicle was named "Dee", but indicated

---

**6.** Parenthetical citations preceded by an "F" refer to the transcript of the hearing held before Judge Polsky on January 21, 22 and 26, 1976.

**7.** Both Casey and Puhalski stated that a routine stop is not a random stop, but rather one made

pursuant to articulable criteria (F40–42, 301–04).

**8.** Mr. Hines is named as a defendant in Counts One and Five of the indictment. He is accused of conspiracy and distribution of narcotics.

that he did not know Dee's last name or address (F51–52). Fisher also stated that he had no way of getting in touch with Dee by telephone (F51–52). As a consequence, Casey asked Fisher if he would mind going to the Ninth Precinct so that the officers could confirm that he was authorized to use the automobile. When Fisher said that he would not mind (F52, 272–73), Casey rode with him to the local station house and Puhalski followed in the patrol car (F52–53, 273). Both Fisher's automobile and the patrol car were then parked in a lot near the station house (F273).

Upon entering the station house, Casey and Puhalski took Fisher directly to a rear "sitting room" (F53, 276, 296). The driver's license was placed on a table in the sitting room (F153) and Puhalski remained with Fisher while Casey went to telephone his unit to see if the New Jersey Department of Motor Vehicles had listed the automobile as stolen (F53, 276). During this period of time, Fisher began to "fumble" with a staple holding his photograph to the driver's license of Waymin Hines. When Puhalski asked Fisher what he was doing, Fisher replied, "Well, it ain't mine anyway." (F277). After being informed of this, Casey asked Fisher for his "right name," and learned that the driver of the car was actually Guy Fisher (F54–55, 277). Fisher also produced other identification bearing this name (F55).

Casey placed Fisher under arrest for criminal impersonation, informed him of his rights under *Miranda v. Arizona*,[9] and began to take his pedigree (F55–56, 277). Puhalski asked the defendant for the keys to his car and left to do an inventory search of the automobile, which was to be vouchered and impounded (F56, 193, 284–85, 312). In the trunk of the automobile, Puhalski saw a shopping bag containing other smaller bags. When he opened one of the smaller bags, Puhalski found what he thought might be United States currency. Opening a second bag eliminated any doubt that Puhalski might have had (F285), and he therefore closed the packages that he had opened,

shut the trunk of the car and went back into the station house to report his find to Casey (F286). Calling Casey from the sitting room, Puhalski told him, "I think there's a million dollars in the trunk of that car . . . . . The trunk is full of money." (F59, 193, 286–87). Casey subsequently retrieved the money, which amounted to $103,702 when it was vouchered (F65, 193).

■ *b. Conclusions of the Court:* As in the Barnes incident, the stop of Fisher properly began as a routine license and registration check following commission of a traffic offense. While Fisher would not have been allowed to leave the scene of the stop unaccompanied after failing to provide adequate answers to Casey's questions regarding the registered owner of his vehicle, he was not under arrest while driving his car to the local precinct since the police officers had no reason to believe that he had committed anything beyond a minor traffic infraction for which no summons had been issued. It follows that his arrest occurred, at the earliest, after he had been caught tampering with the driver's license in his possession. At that time, of course, Casey had ample cause to believe that Fisher was not the person named on the face of the license and, therefore, to arrest him for criminal impersonation.

■ The seizure of the driver's license consequently occurred incident to Fisher's arrest for criminal impersonation and was fully justified. *See, e. g., United States v. Robinson, supra* ; *Gustafson v. Florida, supra.* Moreover, the inventory search of the automobile was necessary in order to protect the interests of its owner, the police department and, indeed, even Fisher, while the automobile was in police custody. As both the federal and state courts have generally recognized, searches of automobiles lawfully in the custody of the police are reasonable when, as here, the process is directed at "securing or protecting the car and its contents." *South Dakota v. Opperman*, 428 U.S. at 73, 96 S.Ct. at 3098; *see Cady v. Dombrowski*, 413 U.S. at

---

**9.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

447–48, 93 S.Ct. 2523, 37 L.Ed.2d 706; *Harris v. United States*, 390 U.S. at 236, 88 S.Ct. 992 (1968); *Cooper v. California*, 386 U.S. 58, 61–62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *United States v. Mitchell*, 458 F.2d 960, 961–62 (9th Cir. 1972); *People v. Sullivan*, 29 N.Y.2d 69, 77, 323 N.Y.S.2d 945, 952, 272 N.E.2d 464, 469 (1971). *But see United States v. Lawson*, 487 F.2d 468, 477 (8th Cir. 1973).

## IV. CONCLUSION

For the reasons which have been stated, both motions to suppress must be, and are, denied.

SO ORDERED.