UNITED STATES of America

v.

Jorge Heldibrado GOMEZ, Irma Mejia-Londono, a/k/a "Irma Mora", Hever Puertas-Serna, a/k/a "Ever Serna", and Henry Serna, Defendants.

No. S79 Cr. 624 (LPG).

United States District Court,
S. D. New York.

Nov. 15, 1979.

Barry Slotnick, New York City, for Jorge H. Gomez.

F. Luis Caraballo, Brooklyn, N. Y., for Irma Mejia-Londono.

David S. Zapp, New York City, for Ever Serna.

Frank Ortiz, Brooklyn, N. Y., for Henry Serna.

Mary Ellen Kris, Mary Jo White, Asst. U. S. Attys., New York City, for United States.

## OPINION

GAGLIARDI, District Judge.

Defendants Jorge Heldibrado Gomez, Irma Mejia-Londono, a/k/a "Irma Mora", Ever Serna and Henry Serna were indicted for conspiracy to violate §§ 812, 841(a)(1) and 841(b)(1)(A) of Title 21 of the United States Code and for possession with intent to distribute cocaine in violation of the same statutory sections. In addition, Gomez was indicted for using a firearm during the commission of a felony in violation of § 924(c) of Title 18 of the United States Code. After the arrest of defendants, officers of both the Drug Enforcement Agency ("DEA"), the New York City Police Department who were assigned to DEA and an investigator from the Immigration and Naturalization Service ("INS") conducted searches at five locations and took statements from the defendants. Defendants now move to suppress the evidence so seized and the statements so made. Following a

three day evidentiary hearing,[1] this court grants in part and denies in part the motions before it.

## STATEMENT OF FACTS

The facts found by this court, after hearing the testimony and assessing the credibility of the various witnesses, are as follows. Agent William F. Mockler, Jr., a group supervisor with the DEA, testified regarding the background of the surveillance that precipitated the challenged searches. In 1977 an informant, previously found reliable, advised Mockler that Irma Mejia, the part owner of a Queens jewelry store, was heavily involved in cocaine trafficking in New York City. From 1977 until August 15, 1979, the name "Irma", followed by one of two telephone numbers, appeared on different documents seized in narcotics investigations. The DEA traced these numbers to a phone at 340 East 80th Street listed to Henry Serna and to a phone in another Queens jewelry store. Investigations during the 1977 to August 1979 period also uncovered other papers which the DEA suspected to be records of narcotics transactions in which Mejia appeared as a monthly multi-kilogram cocaine purchaser. In July 1979, the DEA arrested a suspect in Queens and recovered large amounts of cocaine and other drug paraphernalia. Among the papers seized from the suspect were Irma's name and phone number at a jewelry store and the name "Henry" with a telephone number traced to the East 80th Street apartment. Both were accordingly believed to be customers of the suspect. Mockler, unable at that time to follow this lead, passed this information along to another DEA group to pursue it before Mejia became alerted to the Queens arrest.

Having received this information, New York City police officer Sergeant Richard Werdann obtained a positive identification of Mejia. Thereafter, Werdann and fellow

---

1. Although the moving papers of Mejia and Serna were arguably insufficient to require this court to hold an evidentiary hearing, *See United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969), *cert. denied*, 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970); *United States v. Gillette*, 383 F.2d 843, 848–49 (2d Cir. 1967), the court, with the consent of the government, decided to proceed with the hearing.

officer Detective William Frawley set up surveillance on August 15th at 2 P.M. at 340 East 80th Street. At approximately 5 P.M. Werdann observed Henry Serna, Mejia and a baby in a red Mustang exit the garage. The car was being driven by Serna and was followed to West 83rd Street and Amsterdam Avenue. Serna parked, got out and spoke for several minutes with an Hispanic female. Serna reentered the car and drove to Broadway and 83rd Street where he parked at the curb. A male Hispanic approached the car on the driver's side and conversed with the occupants for a few minutes. Werdann then followed the car to 625 Columbus Avenue, saw it leave that location, and then followed it to West 99th Street and Broadway. After parking the vehicle at a hydrant, Serna left the car to make a phone call from a phone booth on the corner as he looked in the direction of the upper floors of an apartment building located at 243 West 99th Street. Werdann next observed Serna walking toward the entrance of the building at 243 West 99th Street at approximately 6:00 P.M. and, at this point, contacted his headquarters to request the assistance of a supervisor.

Special Agent Patrick Shea, an assistant group supervisor of DEA and a specialist in South American cocaine traffickers, responded to the call. From previous experience Shea knew that the Upper West Side of Manhattan was an area of heavy narcotics activity. At the scene at 6:20 P.M. Shea observed Serna emerge from 243 West 99th Street carrying a gold colored plastic bag labeled "Fashion Boutique" which he placed in the rear of his car. Serna was observed getting into the Mustang and was then followed by the agents, in separate cars, back to 625 Columbus Avenue. Serna entered the restaurant, leaving the bag in the car, and emerged five minutes later from the restaurant. The surveilling agents, communicating over car radios, discussed the events that they had witnessed and reasonably concluded that the bag contained either narcotics or money. They determined, therefore, that if Serna returned directly to his apartment the bag contained only money, the fruits of a completed nar-

cotics transaction and they would not intercept him; but if Serna entered another building with the bag, then the bag contained narcotics and a deal was about to "go down", and they would intercept him.

The red Mustang was followed to Bennett Avenue. All three occupants emerged and headed toward the rear entrance to 295 Bennett Avenue, Serna carrying the plastic bag and Mejia the baby. Frawley, who was directly behind Mejia and Serna, observed them walk down a path leading to the rear entrance. As soon as he saw them enter the building, he ran to the doorway. Frawley raced to the doorway followed by Shea, who had been observing Frawley. Neither attempted to stop Serna or Mejia prior to their entering the building. Once inside the building, Frawley located the door to the stairwell. As both agents entered the stairwell, they heard the door closing on the next landing and ran up to the second floor where they went into the hallway and heard voices and the release of a door chain. They immediately headed around the corner to the direction of the sounds. Frawley, who was then about fifteen feet from apartment 2A, testified that Mejia was no longer in sight but that Serna was just walking over the threshold of the apartment door. Both agents yelled "police" as they held their shields in their hands and ran toward the door. The door was slammed just as they reached it. The agents knocked on the door, and then banged and kicked, announcing loudly that they were police and requesting that the door be opened. Shea put his ear to the door a few times and heard voices, the scurrying of feet and the sound of water running through the pipes. Werdann, who entered the building moments after Frawley and Shea, followed the sounds up to the second floor. As he approached apartment 2A, Werdann saw Shea and Frawley knocking on the door with their shields still in their hands. Werdann, followed by Frawley, then went outside and located the windows of the apartment. Werdann saw Serna at the window and with his shield in hand, yelled to him that he was a police

officer and requested that he come out. Serna retreated and Mejia appeared. Werdann repeated the message to Mejia before she too withdrew. Two officers joined Shea in front of the door and kicked while Shea banged. After approximately seven to ten minutes from the time the door was slammed, one of the occupants opened the door. The agents entered the apartment, placing Serna, Mejia and Gomez, the other occupant, under arrest.

The officers conducted a protective search to insure that no other occupants were present. During the course of the search, they observed the bathroom floor flooded, white powder on top of the toilet bowl and a clear plastic bag floating inside the bowl. Werdann also observed white powder on the kitchen floor and on the bedroom floor what appeared to be the gold "Fashion Boutique" bag from which now protruded two clear plastic bags with white residue. Werdann also stated that he saw a large amount of money in an open safe and in a closet and a loaded .38 caliber pistol on a table. Shea further observed an exposed scale in the kitchen.

Following DEA's standard procedure in cases of an arrest involving suspected illegal aliens, Shea called for an INS investigator. Investigator Victor Rita responded and after Detective Ramos gave the suspects their *Miranda* warnings, Rita interviewed them to determine their alien status. Gomez displayed satisfactory proof of his status as a legal alien, and Rita did not question him further. Mejia, on the other hand, told Rita that she was a Colombian national and had entered the United States illegally. Rita asked Mejia to complete two forms: a rights waiver and a contact report. He then asked Mejia to furnish proof of the biographical information that she had supplied. She responded that she was not carrying any such proof but had the documentation at home. Rita then interviewed Serna, who stated that he had entered the United States on a visitor's visa. Rita determined, however, that Serna was also an illegal alien because it appeared that his visa had long since expired. At the behest of Rita, Mejia and Serna separately executed consent to search forms for their apartment at East 80th Street. Rita advised them of their right to withhold consent to the search and that although he would search for documentation to verify their identification and alien status, he would be accompanied by a DEA agent and that anything found could be used against them. At approximately 10:30, Rita, Mockler and Shea accompanied Mejia to 80th Street. In the course of searching for documents, Rita found a loaded pistol, ammunition, money and jewelry.

As Mejia was being taken to 80th Street, Werdann and Sergeant Skelly, a DEA supervisor drove Serna to 243 West 99th Street. Although the keys that the agents took from Serna did not open the locked vestibule door, the agents gained entry to the building after ringing the superintendent's bell. Werdann walked towards the superintendent's door while Skelly remained with Serna at the end of the hallway. The time was between 10:30 and 11:00 P.M. Werdann asked Mrs. Fernandez, the superintendent, if she recognized Serna. Fernandez, who was called by the government, testified that she recognized Serna as the person she had seen at the elevator two weeks earlier who had told her that he would be staying in apartment 6B and that she should not be "scared" if she saw him in the apartment.

The agents then checked the tenants' directory which listed Y. Londono as the tenant of apartment 6B. The agents led Serna to the 6th floor and Werdann knocked on the door of 6B. The only response was the opening of the peephole by the occupant of the apartment. Werdann, shield in hand, announced that he was a police officer investigating a dispute and requested that the occupant open the door. Serna and Skelly were on the landing between the 5th and 6th floors and were not visible from the interior of the apartment. Werdann then saw the peephole close and heard the bolt slide. He again announced his authority but to no avail. Leaving Skelly with Serna, he returned to the street to phone for assistance. He was advised that Frawley and

Lieutenant Greeley, who took part in the Bennett Avenue arrest would join them. Werdann then climbed the fire escape to the 6th floor to observe 6B. Inside the building, Skelly handcuffed Serna to the landing and was alone with him for approximately one-half hour until the arrival of the two additional police officers. While waiting for assistance, Skelly listened at the door but was unable to determine what was going on inside the apartment. When Frawley and Greeley arrived at approximately 11:30 or 11:45, they led Serna to the door and asked him to request the occupant[s] to open the door. Although it is unclear whether the agents asked Serna to speak in English or Spanish, Serna said something to the occupant[s] in Spanish, which none of the officers could comprehend. The agents then began to bang on the door because they "realized that Henry Serna was not going to be helpful to us in getting into the apartment." Skelly testified that they continued to bang on the door and stated to the occupant[s] that they would remain all night until the door was opened. Frawley put his ear to the door and heard the sounds of a door sliding and water running. Greeley later did the same and heard the flushing of a toilet. Twenty to thirty minutes later, Serna, without provocation, offered to assist the agents in gaining entry to the apartment. He was taken over to the door and the agents knocked. Serna spoke loudly in an authoritative tone in Spanish two or three times. The occupant then opened the door. Skelly and Greeley entered the apartment and arrested the occupant, identified by Serna as his brother, Hever Puertas Serna ("Ever"). Skelly walked through the apartment to secure it while Greeley watched the suspects. Skelly opened a closet in the hallway and observed a large press. He also observed damp white plastic bags on a garbage pile in the kitchen. Werdann entered the apartment at approximately 12:30 A.M., and made another protective search, and observed a mixer on the drainboard.

Werdann then went to East 80th St. to pick up Rita because the agents believed Ever to be an illegal alien. When Rita arrived at 99th Street, he identified himself to Ever, who told him that he was Colombian and had come into the United States illegally two weeks prior. Rita asked Ever if he had any documents that could verify his alien status. Notwithstanding the fact that Ever responded in the negative, Rita, based upon his experience that aliens often have such proof but are unfamiliar with the documents, asked Ever for consent to search the apartment. Ever responded affirmatively. Unlike Mejia's and Henry Serna's consent to search East 80th Street, Ever did not fill out a written consent form since Rita did not have any with him. Rita, accompanied by the agents, proceeded to search the bedroom and recovered a small quantity of cocaine from a shoe bag and $151,000 from under the mattress or boxspring.

After the search, Ever told Rita that he did not live in the apartment but had been taken there by his brother to watch it. The agents attempted to lock the apartment door but they could not locate the key among the keys found in Ever's possession. Ever once again stated that he did not live in the apartment but that he lived with Henry at East 80th Street. Rita observed, however, that Ever's key did not match the key to the East 80th Street apartment and therefore told Ever that he knew Ever did not live there. Ever then responded that he lived at 85th and 1st Avenue but could not remember the exact address. Ever agreed to take Rita there to see if any documents pertaining to his alien status could be located. Rita, along with some of the agents, drove to the vicinity of 85th Street and 1st Avenue until Ever recognized a building at 440 East 85th Street. Ever opened the door to his apartment; the agents entered and searched. Rita found a press and some written materials but no documents related to Ever's immigration status.

On the morning of August 16th, the day of arraignment, the defendants were brought before an Assistant United States Attorney for preliminary questioning. The defendants stated that they did not want to answer any questions without their lawyers

being present. Somewhere between the United States Attorney's office and the magistrate's courtroom, Rita met again with the defendants. After giving them their rights in both English and Spanish, Rita obtained some additional statements from Mejia, Serna, and Ever. Although Rita recalled hearing some discussion before the arraignments about locating counsel for the defendants, he stated that he neither knew nor specifically inquired whether any of the defendants had already retained counsel.

In addition to the warrantless searches described above, the DEA agents applied for and were granted warrants to search several premises. In the late evening of August 15, Magistrate Bernikow signed a warrant, at his home in the Eastern District, based on the affidavit of Robert Palombo, authorizing a search of apartment 2A, 295 Bennett Avenue. Magistrate Bernikow also issued a warrant on August 16th, upon the affidavit of Shea, to search a safety deposit box allegedly rented by Gomez. A second warrant to search Bennett Avenue was issued by Magistrate Tyler on August 28th on the affidavit of Shea. Magistrate Tyler also issued a warrant based upon Palombo's affidavit for a second safe deposit box allegedly under Gomez's control. On September 11, Magistrate Gershon issued a warrant to search 340 East 80th Street. Finally, on September 25, Magistrate Raby issued a warrant upon the affidavit of Shea to search 230 West 75th Street, another apartment allegedly leased to Gomez. Gomez attacks the validity of all these warrants except for the one covering the E. 80th Street search.

## DISCUSSION

### A. *Bennett Avenue Arrests and Search*

Proper analysis of the warrantless arrests at Bennett Avenue and the subsequent search incident to the arrests is a two step process: the first step covers events preceding the agents' command in the hallway outside of apartment 2A; the second step covers the period from that moment until the agents entered the apartment, formally placed the three occupants under arrest, and searched the premises. The propriety of the agents' actions culminating in their demand that the suspects stop—implicit when they shouted "police"—must be decided before this court considers the legality of the agents' actions subsequent to that command.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that "a police officer may in appropriate circumstances and in appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880. The officer, however, according to the Court, "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Id.* at 21, 88 S.Ct. at 1880; *see also United States v. Price*, 599 F.2d 494, 500 (2d Cir. 1979) and cases cited therein.

The following "articulable" facts can be distilled from the testimony:

1. The agents who were conducting the surveillance knew that Mejia was a suspected narcotics dealer.

2. The car in which Mejia was a passenger stopped on at least two occasions in an area known to the agents as one of high narcotics activity, ranging from street sales to wholesale deals, for meetings with unidentified persons. The officers could have drawn an inference that the car and/or its occupants were expected and/or recognized.

3. The driver made a phone call from a booth outside a building while appearing to look at an upper floor of the building.

4. He then emerged approximately twenty minutes later, carrying a small plastic shopping bag. The building is in an area of high narcotics activity.

5. The car then returned to one of its previous locations, also in an area of high narcotics activity, for a brief stop.

▮ In analyzing the reasonableness of the agents' actions which led to the at-

tempted investigative stop based on these facts, this court is mindful that the "circumstances surrounding a stop 'are not to be dissected and viewed singly; rather they must be considered as a whole.'" *United States v. Price, supra*, 599 F.2d at 501, *citing United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977), *quoting United States v. Magda*, 547 F.2d 756, 758 (2d Cir. 1976), *quoting United States v. Hall*, 174 U.S.App. D.C. 13, 525 F.2d 857, 859 (1976) and that these circumstances "'are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *United States v. Price, supra*, 599 F.2d at 501, *citing United States v. Oates, supra*, 560 F.2d at 61, *quoting United States v. Magda, supra*, 547 F.2d at 758, *quoting United States v. Hall, supra*, 525 F.2d at 859. Judged against this standard, there can be no doubt that the agents had sufficient cause for suspicion. First, "a police officer's knowledge of a person's reputation as a prominent narcotics trafficker can properly be considered . . . as an element justifying the officer's reasonable suspicion . . ." *United States v. Oakes, supra*, 560 F.2d at 59; see also *United States v. Santana*, 485 F.2d 365 (2d Cir. 1973). Second, while the stops along the Upper West Side prior to Serna's entrance into 243 West 99th Street are capable of innocent interpretation, they heightened the agents' suspicions that "criminal activity may be afoot." *Terry v. Ohio, supra*, 392 U.S. at 30, 88 S.Ct. at 1884. In short, this was the type of behavior pattern which "may seem innocuous enough to the untrained eye [but] may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before." *United States v. Oates, supra*, 560 F.2d at 61; *see also Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Third, bags, whether brown paper or gold plastic, "ha[ve] long been a sort of hallmark of the narcotics business." *United States v. Santana, supra*, 485 F.2d at 368; *see also United States v. Price, supra*, 599 F.2d at 500 (shoulder bag). The bag was especially suspicious since it appeared to be the object of Serna's trip into the

building and perhaps even the object of the preceding phone call. Again, while the bag could have contained something other than narcotics, it was reasonable for the agents to conclude that it contained money or narcotics based upon the "mosaic" of information before them. *See United States v. Price, supra*, 599 F.2d at 501. Thus, the agents' suspicions were justifiably aroused after they became aware of the foregoing articulable facts.

In determining the lawfulness of the agents' conduct on August 15th, this court must next focus upon the moment at which the agents decided to conduct the *Terry* stop. Neither Terry nor its progeny have established firm guidelines for calculating the moment at which an investigative stop is appropriate. *United States v. Price, supra*, however, is somewhat illuminating. In *Price*, several DEA agents were assigned to monitor flights arriving at LaGuardia Airport from "source cities." During the course of their surveillance, the agents' attention was drawn to Price, who appeared nervous and was continually scanning the area while waiting for his baggage. After Price and his companion picked up their luggage, they left the terminal, hurried to the street, and hailed a cab. Despite the fact that the agents could have stopped the suspects "as soon as their suspicions were aroused," *id.*, at 500, or at least at some point before they entered the cab, *id.*, *see also id.*, at 501, n.8, the agents instead decided to follow the suspects to their destination at 106th Street in Manhattan. Price emerged from the cab and the agents approached him "just as he reached the entrance of the [apartment] building." *Id.* at 500. Based upon the articulable facts that aroused the agents' suspicions, the Second Circuit held that "the agents acted reasonably both in initiating the encounter and *in pursuing it to its conclusion.*" *Id.* at 503 (emphasis added).

 The agents in the instant case had a similar objective. They decided, based upon their experience in handling other drug investigations, that it would be reasonable to assume that the bag contained

narcotics, as opposed to money, if the suspects did not return directly home, but instead carried the bag out of the car and into another location. After Serna parked the car on Bennett Avenue, he and Mejia walked toward the rear entrance to the apartment building at 295 Bennett Avenue.[2] This conduct heightened the agents' suspicions that the bag contained narcotics. The agents, consistent with the limits of *Terry* and *Price*, could have attempted to stop the suspects at that time. *United States v. Price, supra*, 599 F.2d at 502–03 *citing Terry v. Ohio, supra*. Shea and Frawley, remaining some distance behind the suspects apparently to avoid detection, testified, however, that they lost sight of Mejia and Serna at the entrance of the apartment building. This testimony is fully credited by the court. At this point, the agents entered the staircase and the hallway in an attempt to catch up to Mejia and Serna. It is well settled that the common areas of an apartment building are public places in which individuals do not have a reasonable expectation of privacy. *See, e. g., Sibron v. New York*, 392 U.S. 40, 50, 88 S.Ct. 1889, 1896, 20 L.Ed.2d 917 (1968); *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *United States v. Calhoun*, 542 F.2d 1094, 1100 (9th Cir. 1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977); *United States v. Moore*, 463 F.Supp. 1266, 1270 (S.D.N.Y.1979) and cases cited therein. The agents further testified that they next saw Serna at the threshold of the open door to apartment 2A. They immediately attempted to initiate an investigatory stop but were thwarted by Serna's entrance into the apartment and the subsequent slamming of the door. The agents were justified in endeavoring to "maintain the status quo", *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), in order to attempt to question the suspects. The agents properly attempted to intercept the suspects at the threshold of the apartment, which, like the hallway, is "not in an area where [they] had any expectation of privacy." *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976).

A more complex analysis is precipitated by the events which occurred after the police shouted "police" in the hallway of the building. While the total time which elapsed from that moment until the occupants admitted the police to the apartment is estimated to be between seven to ten minutes, it is essential to isolate acts occurring within a matter of seconds to which legal significance attaches. The ultimate issue, the propriety of the search at Bennett Avenue, depends upon the legality of the arrests, which requires a finding of probable cause at the moment of arrest, or earlier. *See Sibron v. New York, supra*, 392 U.S. at 77, 88 S.Ct. at 1909 (Harlan, J., concurring). A prior step in the analysis is to isolate the moment of arrest, *see Henry v. United States*, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); *Rios v. United States*, 364 U.S. 253, 261–62, 80 S.Ct. 1431, 1436, 4 L.Ed.2d 1688 (1960) which logically requires enumerating the acts that constitute an arrest.

In *Henry v. United States, supra*, the Supreme Court stated that "the arrest, for the purposes of th[is] case, was complete" . . . . "[w]hen the officers interrupted the two men and restricted their liberty of movement." *Id.*, at 171. Other courts have attempted to refine this definition—a task described by Chief Judge Kaufman as one of "deceptive simplicity." *United States v. Bonanno*, 180 F.Supp. 71 (S.D.N.Y.1960). In *United States v. Barnes*, 443 F.Supp. 137 (S.D.N.Y.1977), *rept'd on appeal*, 604 F.2d 121 (2d Cir. 1979), for example, the court defined "arrest" as " 'an actual or constructive seizure or detention' which is meant to be an arrest of a person and which would cause a reasonable

---

**2.** The government argues that the agents had probable cause to arrest Mejia and Serna at the moment they stepped out of the car with the bag in hand at 295 Bennett Avenue. Although the court has not adopted this view, a finding of probable cause at this juncture is not implausible.

man, innocent of any crime, to believe that he had been arrested." *Id.*, at 144. A similar definition was suggested by the United States District Court for the District of Columbia in *United States v. Washington*, 249 F.Supp. 40 (D.C.D.C.1965), *aff'd* 401 F.2d 915 (D.C. Cir. 1968):

> . . . the time of arrest is not necessarily that point in time when the police officer formally proclaims that the accused is being taken into custody. A man is under arrest at that point when the officer has effectively restrained the defendant, and the defendant is cognizant of that restraint.

*Id.*, at 41. Measured against these standards, the court determines that the arrest did not occur until after Serna and Mejia saw Werdann from the window. At that moment, they had reason to believe that their liberty was restrained. Defendants argue, however, that the arrest occurred when the agents began pounding on the door, and thus anything that the agents heard within the seven to ten minutes which followed the initial pounding cannot be used to establish the requisite probable cause to arrest. This court disagrees. The agents neither brandished weapons nor said anything that could have led the suspects to believe that they were under arrest at the moment of the initial pounding. *See United States v. Oates, supra*, 560 F.2d at 57 (2d Cir. 1977). Rather, the pounding merely appeared to be an attempt by the agents to prevent the frustration of a lawful *Terry* stop and to "maintain the status quo." *Adams v. Williams, supra*, 407 U.S. at 146, 92 S.Ct. at 1923. Defendants strenuously argue that this court should attach significance to Shea's unexpressed subjective intention "to arrest Mr. Serna at the point where [Shea] flashed [his] badge and yelled "police" and "to break the door down" immediately after he banged against it. In a comparable situation, however, the Second Circuit noted that the agent's "intention to act upon [his] belief is of no consequence here. What controls [in fixing the moment of arrest] is not what [the agent] subjec-

tively intended to do but what he did." *United States v. Oates, supra*, 560 F.2d at 58. *See also, United States v. Vital-Padilla*, 500 F.2d 641, 644 (9th Cir. 1974).

Having identified the moment when the suspects were under arrest, the court can now consider whether or not probable cause to arrest existed at this moment, or earlier—that is, "whether at that moment the facts and circumstances within [the agents'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [man's] believing that [the occupants of the apartment] had [been or were committing a crime".] *United States v. Nieves,*, 609 F.2d 642 at 648 (2d Cir. 1979), *quoting Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Phrased another way, the question before the court is whether or not the agents' suspicions, which were sufficient to warrant a *Terry* stop, matured into probable cause to arrest based upon the activities of the defendants following the officers' command and the suspects' refusal to stop. Answering this question first requires the court to assess the reasonableness of the agents' conduct in response to the defendants' refusal to cooperate.

█ Neither *Terry* itself nor subsequent *Terry* cases in the Supreme Court have directly addressed the issue of what is proper police conduct if a suspect fails to cooperate, or flees, when the police initiate an investigatory stop.[3] "The lower courts have likewise seldom been faced with the issue, apparently because in an overwhelming majority of instances suspects comply with the verbal command to stop." 3 La-Fave, *Search and Seizure, A Treatise on the Fourth Amendment* (1st ed. 1978), § 9.2 at 31. This court, however, is not without some guidance. The concurring opinion of Justice White in *Terry* is particularly instructive. Justice White noted:

> Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way. *However given the proper circumstances, such as those in this*

---

**3.** *Cf. Brown v. Texas*, 443 U.S. 47, 53 n.3, 99 S.Ct. 2637, 2641 n.3, 61 L.Ed.2d 357.

*case, it seems to me the person may be briefly detained against his will while pertinent questions are directed to him. Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation.*

*Id.* 392 U.S. at 34, 88 S.Ct. at 1886. (emphasis added). At least two commentators have also taken the view that *Terry* gives a police officer not only the right to stop a suspect when he can point to articulable facts that criminal activity is afoot, but also the necessary power to implement that right. The Model Code of Pre-Arraignment Procedure § 110.2(3) (Proposed Official Draft, 1975) states that: "it would be frustrating and humiliating to the officer to grant him an authority to order persons to stop, and then ask him to stand by while his order is flouted." *Id.* at 384–85. The authors of the Model Code would therefore authorize an officer to "use such force, other than deadly force, as is reasonably necessary to stop any person . . . or to cause any person to remain in the officer's presence." *Id.*, the Model Code continues to note that:

> . . . [it is not] anomalous that this section authorizes force to compel the persons to stop but relies thereafter on the person's cooperation. Certainly a person who has had to be forcibly stopped is unlikely to prove cooperative thereafter, but the officer may wish to immobilize such a person . . ., or simply to procure a period of time during which he can decide whether to make an arrest. By this provision he is not forced to arrest at once. . . . Moreover, if force were not authorized to enforce an order to stop, in all probability it would be used anyway, because a person who flees upon an order to stop will usually be subject to lawful arrest and thus the force authorized to effect an arrest.

*Id.* at 285. The year after *Terry* was decided, another commentator predicted that: [q]uestions will be raised as to whether there is a right to refuse to answer questions during a stop, whether if such right exists, it extends to a refusal even to produce identification, and whether lack of cooperation may serve as a factor in a finding of probable cause for arrest. If the suspect need not cooperate at all with the policeman, [and the officers can not take any further steps to complete the frustrated stop] the value of field interrogation would be limited, and the purportedly strong state interest in the use of this practice to deter crime—upon which the reasonableness of the stop and frisk is based—might be brought into question.

The Supreme Court, 1967 Term, 82 *Harv.L. Rev.* 95, 187 (1968). Finally, this court notes that "the permissibility of a particular law enforcement practice [must ultimately be] judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). *See also Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1879, quoting *Camara v. Municipal Court,* 387 U.S. 523, 534–35, 536–37, 87 S.Ct. 1727, 1733–35, 18 L.Ed.2d 930 (1967).

■ The court concludes that it was reasonable for the police officers to attempt to continue their investigation and to pound on the door of the apartment into which the suspects had retreated after they ignored the officer's command. A reasonably cautious police officer viewing the suspects' acts would have been justified in believing that the suspects were attempting to evade the agents' authority. Such furtive actions at the approach of law enforcement officers colors conduct that hitherto appeared innocent and invites continued observation. *See Sibron v. New York, supra,* 392 U.S. at 66, 88 S.Ct. at 1904; *United States v. Pope,* 561 F.2d 663, 668 (6th Cir. 1977) (Celebrezze, J.); *United States v. Young,* 598 F.2d 296, 305 (D.C. Cir. 1979) (Robinson, J., concurring). The agents' response to the suspects' action, objectively viewed, was to follow the suspects and to demand that they open the door. As the Supreme Court has noted, "The Fourth Amendment does not require a

policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). Although the *Adams* Court was confronted with a different factual situation from the instant one, its admonition is broadly applicable to situations in which the suspects attempt to evade the agents. The District of Columbia Court of Appeals agreed with this position in a case involving a factual setting very similar to the case before this court. In *Edwards v. United States*, 364 A.2d 1209 (D.C.App.1976), a detective noticed appellants walking up a street carrying some stereo equipment. When the detective announced that he was a police officer and wanted to talk to them, the two suspects ran away. The officer left his car and chased the suspects into an apartment building, up a flight of stairs, and then into an apartment, the door to which was not completely closed. Once inside the apartment, the detective asked the suspects whose property they were carrying, but received no response. The suspects were arrested the following day after the equipment was identified as stolen property. In denying appellants' motion to suppress, the court held that 1. *Terry* authorizes an officer to pursue a suspect once he retreats, rather than stops and answers the officer's questions, and that 2. the officer's pursuit of the suspect was not unlawful merely because it began in the street and ended in the apartment. *Id.*, at 1214–15. Accordingly, this court holds that the agents' continued pursuit of the suspects after they retreated and slammed the door did not contravene the Fourth Amendment.

This court also holds that the agents' suspicions which were sufficient to warrant a *Terry* stop matured into probable cause to arrest at the moment of arrest or earlier. *See Sibron v. New York, supra*, 392 U.S. at 76, 88 S.Ct. at 1908 (Harlan, J.) (an "escalating encounter" between a policeman and a citizen may begin "with a friendly conversation but [end] in imprisonment"); *see also United States v. Rico*, 594 F.2d 320, 326 (1979); *United States v. Christophe*, 470 F.2d 865, 869 (2d Cir. 1972); *United States v. Flores*, 462 F.Supp. 702, 708 (E.D.N.Y. 1978). Within seconds after the agents began to pound on the door, Shea heard voices, the scurrying of feet and the sound of water running through the pipes. These sounds, coupled with the retreat and the slamming of the door and the defendants' conduct earlier in the day, *see* pp. 1000–1001, *supra*, establish probable cause to arrest.[4] Since probable cause to arrest existed prior to the moment of arrest, *see* pp. 1002–1003, *supra*, the agents lawfully conducted a cursory protective search after they entered the apartment. *See, e. g., United States v. Diaz*, 577 F.2d 821, 823–24 (2d Cir. 1978); *United States v. Christophe*, 470 F.2d 865, 869 (2d Cir.), *cert. denied,* 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1972). Items of an incriminating nature that were recovered during the search could be seized without a warrant because they had inadvertently come into plain view of law enforcement officials who were lawfully in the place in which the items were seen. *See, e. g., United States v. Ochs*, 595 F.2d 1247, 1257 (2d Cir. 1979); *United States v. Diaz, supra*, 577 F.2d at 823.

**B.** *340 East 80th Street Search*

Both Mejia and Serna executed written consent forms to permit Rita to

---

4. Defendant Gomez neither can nor has attempted to rely on the "mere presence" doctrine enunciated in *United States v. DiRe*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948) to argue that the agents lacked probable cause to arrest once they entered the apartment. During the approximately seven to ten minutes that the agents pounded on the door, Gomez apparently took no actions inconsistent with those of Mejia and Serna and it was reasonable

for the agents to believe that all the occupants of the apartment were contributing to the sounds of the running of water and the scurrying of feet. "Therefore, some additional circumstance from which it is reasonable to infer knowledge of or participation in criminal enterprise [has been] shown. *United States v. Vilhotti*, 323 F.Supp. 425 (S.D.N.Y.1971) *quoting United States v. DiRe, supra.*

search their apartment at 340 East 80th Street. Rita explained, and the consent forms state, in both English and Spanish, that Shea would accompany Rita and that anything recovered during the search could be used against the signatories "in court, or in any immigration proceeding, or administrative proceeding." Neither Mejia nor Serna testified at the hearing and their attorneys' affidavits are all that attempts to contradict Rita's testimony that the defendants voluntarily consented to the search. This court finds Rita's testimony fully credible and accordingly finds that the government satisfied its burden that the consents were "the product of an essentially free and unconstrained choice." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968).

■ This court, *sua sponte*, raised an additional issue relating to the East 80th Street search—namely, whether or not an INS officer, searching for documentation of an individual's alien status, could properly seize items that would be given to the DEA for use against the defendant in a drug prosecution. The government relies upon *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1959) and *United States v. Alvarado*, 321 F.2d 336 (2d Cir. 1963) in support of the propriety of the cooperative activities between the two agencies. Although the scope of the *Abel* search would be illegal today after *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the holding of *Abel* still appears to be good law. In *Abel*, the Supreme Court held that items seized during a search incident to an arrest for a violation of an alien registration procedure could be used in an unrelated criminal prosecution so long as (1) the items were "legitimately seized" pursuant to the INS agent's authority and that (2) there was no showing that the agents acted in bad faith. *Abel v. United States, supra*, 362 U.S. at 240–41, 80 S.Ct. at 697–98. In the instant case, it cannot be doubted that the items were "legitimately seized" under *Abel* because the defendants voluntarily executed consent forms and because

there is a "nexus . . . between the items seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967). Nor can it be said that the cooperation between Shea and Rita was a mere pretext for unlawful purposes. Accordingly, this court holds that the search of the apartment at East 80th Street was lawful, and the items seized shall not be suppressed.

## C. 243 West 99th Street Arrest and Searches

### 1. Standing

■ In the superseding indictment none of the defendants is charged with possession of any of the contraband seized at 243 West 99th Street. The government therefore correctly contends that no defendant has automatic standing to move to suppress the items seized from that apartment. *See Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Galante*, 2 Cir., 547 F.2d 733 (1976); *United States v. Oates,* 2 Cir., 560 F.2d 45 (1977). Thus, unless a defendant has demonstrated the requisite interest to establish violation of his own Fourth Amendment rights, the validity of the search and seizure as to that defendant is not an issue properly before this court. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court held that a defendant's right to challenge a search and seizure "requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* at 140, 99 S.Ct. at 429. In so holding, the *Rakas* Court limited its earlier holding in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), that "anyone legitimately on the premises where a search occurs may challenge its legality" and suggested that *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), should furnish the guiding principle for "defining the scope of the interest protected by the Fourth Amendment." *Id.*

The testimony supports Henry Serna's claim that the search of apartment 6B infringed upon his rights under the Fourth Amendment. Mrs. Fernandez, the building superintendent testified that she told Werdann that she recognized Serna and that "he [was] living in the building" on August 15th. Fernandez also testified that she knew that the tenants of apartment 6B were on vacation and that on approximately August 1st, she had met Serna in the building who told her that he would be staying in 6B. The inference fairly to be drawn from her testimony is that Serna, like the petitioner in *Jones*, was not merely a "casual visitor" at the apartment, *Rakas v. Illinois*, 439 U.S. at 142, 99 S.Ct. at 430, and that he had a "legally sufficient interest in [the] place . . . so that the Fourth Amendment protect[ed] him from unreasonable governmental intrusion into that place." *Id.*[5]

Ever has also established standing to contest the search and seizure conducted by the agents in apartment 6B. Rita testified that Ever told him that he had been watching the apartment for his brother Henry for several days. Ever, who was on the premises at the time of the search in the late evening of August 15th, did not open the door until the agents had been outside for approximately an hour and one-half. Ever's presence there indicates that, with the exception of his brother, "[he] had complete dominion and control over the apartment and could exclude others from it." *Rakas v. Illinois, supra*, 439 U.S. at 149, 99 S.Ct. at 433. The mere fact that Ever admitted to Rita that he did not have a key to the apartment is not determinative of the standing issue *sub judice*. *Rakas* contemplates an analysis which focuses upon defendant's expectation of privacy, rather than any single indicia of privacy or proprietary interest.

The government, however, asserts that the defendants have the burden of proving standing, and, more significantly, that the defendants can not satisfy their burden by relying on the government's proof established through the testimony of government witnesses. While the government's first contention is an accurate reflection of the law, *see, e. g., Rakas v. Illinois, supra*, 439 U.S. at 132 n. 2, 99 S.Ct. at 424 n. 2; *United States v. Galante*, 547 F.2d 733, 739 (2d Cir. 1976), its second contention is not. It is elementary hornbook law that "the question [of burden of proof] is not whether the plaintiff or the defendant has introduced the evidence which discharges the burden, but whether such evidence has been introduced." J. Maguire, J. Weinstein, J. Chadbourn, J. Mansfield, *Cases and Materials on Evidence* 1014 (6th Ed. 1973). The Second Circuit recognized this proposition in *Galante*. Before reaching its conclusion that the appellants did not establish standing in that case, the court stated that:

> [t]he trial record is somewhat unclear [on the standing issue]. All parties seem to have assumed, after a brief objection by the government, that there was standing to object, and proceeded to the merits of the argument. *In light of this, we have independently scrutinized the record for evidence which might establish standing, despite the failure of the appellants to introduce evidence on this point at the suppression hearing.*

*United States v. Galante, supra*, 547 F.2d at 739 n. 10 (emphasis added). Having determined that Ever and Serna have standing to suppress the evidence seized at 99th Street, the court must next consider the

---

**5.** Rules 104(a) and 1101(d)(1) Fed.R.Evid., provide that a court is not bound by the rules of evidence in making factual determinations preliminary to the admissibility of evidence. Consequently, there is no automatic rule against receiving hearsay evidence in suppression hearings in instances in which the trial court can accord such evidence the weight that it deems desirable. *See United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). This court has assessed the credibility of Fernandez and Rita whose hearsay statements establish standing on the part of Serna and Ever to contest the search at West 99th Street, *see infra*, and finds nothing to raise serious doubts as to its veracity.

legality of the 99th Street search and seizure.[6]

### 2. Consent and Exigency

 The government argues that even if this court concludes that defendants have standing to contest the search, the motion to suppress should nevertheless be denied because the circumstances of the entry at 99th Street support a finding of either consent or exigency to justify the warrantless entry. As the court noted regarding the East 80th Street search, the government has the burden of proving that a consent was freely and voluntarily given, *Bumper v. North Carolina, supra,* 391 U.S. at 548, 88 S.Ct. at 1791 (1968), as well as the burden of showing exigent circumstances to justify a warrantless arrest, *see United States v. Campbell,* 581 F.2d 22, 25 (2d Cir. 1978).

██ It is beyond cavil that "[t]he question [of] whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2047. In *Schneckloth,* the Supreme Court continued to note that only by "analyzing all the circumstances of an individual consent . . . can [it] be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." *Id.* at 233, 93 S.Ct. at 2050. In deciding whether or not Ever voluntarily opened the door to the agents, the proper analysis proceeds as if the question were simply whether a consent to search was voluntary. The actual search of the 99th Street apartment was incident to Ever's arrest in the first instance and by consent to Rita thereafter.

██ In concluding that Ever's act was not voluntary, this court considers a number of facts. First, Ever responded negatively to the agent's initial request that he open the door. Thereafter, he continued to resist the police efforts for a period of one and one-half to two hours. Although persistent refusal to accede to police demands over an extended period of time is not an absolute bar to a finding of consent at a later moment, "it would seem that the suspect's earlier refusal is a factor which [should be] properly taken into account." 2 LaFave, *Search and Seizure, supra,* § 8.2 at 658. Second, from the time that the agents first went to the apartment to the moment when Ever finally opened the door, additional officers arrived at the scene. During this period, the police stated that they would remain all night, if necessary, until Ever opened the door. These facts indicate that the officers were certainly not contemplating an undertaking that depended upon the cooperation of the suspect and that Ever may well have yielded to the officers' show of authority based upon the belief that he had no alternative. Third, the court has taken into consideration the "characteristics of the accused (such as youth, education and intelligence)." *United States v. Price, supra,* 599 F.2d at 503. The record establishes that Ever entered the United States illegally two weeks prior to arrest, spoke little, if any English, and did not have a high school education. In sum, the initial refusal, the number of police assembled outside the apartment, the amount of time that passed between the agents' arrival and the opening of the door and the characteristics of the accused all lead to the conclusion that Ever's act was not "voluntary".

██ The government's final argument in support of the search at 99th Street is that exigent circumstances required the agents to act promptly and that the warrantless arrest therefore met the test set forth in *United States v. Campbell,* 581 F.2d 22, 25–26 (2d Cir. 1978) and *United States v. Reed,* 572 F.2d 412, 424 (2d Cir. 1978). In *Reed,* the Second Circuit held that the

---

**6.** There was discussion after the hearing was closed about a lease for the apartment at 243 West 99th Street, naming Y. Londono as lessee, recovered at 340 East 80th Street. However, Mejia has not introduced evidence to demonstrate standing to contest the search at 99th Street, nor is there any proof that she was the lessee in the record.

Fourth Amendment permits a warrantless entry of a suspect's home in order to effect a felony arrest based upon probable cause only in situations in which the government can establish that exigent circumstances existed at the time of the entry. *Id.,* at 424. Among the factors deemed relevant in determining whether or not exigent circumstances existed are:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*Id.*

■ In applying the principles of *Reed* to the facts of the present case, the only criteria which are definitely satisfied are that the offense is one which would be considered grave, *see, e. g., United States v. Moore,* 463 F.Supp. 1266, 1271 (S.D.N.Y. 1979), and that there was strong reason to believe the suspect was on the premises. Weighed against these factors, however, are considerations which tip decidedly in favor of obtaining a warrant before conducting a search at West 99th Street. Even assuming that another conspirator lived at 295 Bennett Avenue and that he could have informed Ever about the arrests, the agents did not arrive at Ever's apartment until approximately three hours after the initial arrest, and therefore, it is highly likely that whatever exigency may have existed had long since passed. Once the agents knew that Henry had been staying in apartment 6B, they could have sought a warrant while surveilling the apartment. Moreover, if any exigent circumstances existed that would "lead a reasonable person to believe that unless an entry and arrest [were] made immediately the suspect may escape [or] destroy essential evidence," *United States v. Campbell, supra,* 581 F.2d at 26, these circumstances appear to have been created by the agents' own attempts to gain entrance to the apartment.

### 3. *Subsequent INS Search of West 99th Street*

Finally, the government asserts that, even assuming *arguendo* that the initial search was improper, as this court has held, Ever consented to Rita's subsequent search of the apartment and therefore the evidence seized in the course of that search should not be suppressed.

In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1960), the Supreme Court stated that:

[it] need not hold that evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Id.,* at 488, 83 S.Ct., at 417, *quoting* J. Maguire, *Evidence of Guilt,* 221 (1959). In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Court, elaborating on the above-quoted language from *Wong Sun,* held that advising a defendant of his *Miranda* rights "*per se* cannot always make the act [of confessing] sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Id.,* at 603, 95 S.Ct., at 2261. The Court continued to note that each case had to be decided on its facts, but that the relevant considerations in all situations would be the "temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. at 2261.

■ In the instant case, even if Ever's consent to Rita satisfies the "voluntariness" test of *Schneckloth v. Bustamonte, supra,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854,

the court must still determine whether or not Rita's interview with Ever, leading to Ever's verbal consent to search, was "sufficiently an act of free will to purge the primary taint" of the unlawful entry. *See, Brown v. Illinois, supra,* 422 U.S. at 602, 95 S.Ct. at 2261. Rita arrived at the apartment within a short time after the arrest. Notwithstanding the fact that Ever claimed to have no documents to prove his alien status, Rita continued to seek Ever's consent to search. Prior to obtaining the consent, Rita read Ever a statement advising him that anything that he recovered could be used against him in any criminal prosecution. It appears that Rita intended the rendition of this statement to protect Ever's Fourth Amendment rights in much the same way that the officers in *Brown* intended the rendition of the *Miranda* warnings to protect the suspect's Fifth Amendment rights. However, just as the *Brown* court held that the *Miranda* warnings did not dissipate the illegality of the arrest, so too does this court hold that Rita's statement to Ever did not cure the initial illegality. Accordingly, the "fruits" of the INS search at West 99th Street must be suppressed.

### D. *440 East 85th Street Search*

■ The question of whether or not the consent to search 440 East 85th Street was tainted by the illegality of the arrest at 243 West 99th Street need not be reached if this court concludes that Ever's verbal consent to search the apartment fails to meet the test of voluntariness established by the Supreme Court in *Schneckloth v. Bustamonte. See generally* 3 LaFave, *Search and Seizure, supra,* § 11.4(d) at 644. The elements of the *Schneckloth* test were discussed previously in connection with Ever's consent to the initial entry at 243 West 99th Street. This court finds that the circumstances surrounding Ever's alleged consent at the East 85th Street apartment are equally suspect. Ever only told Rita about the existence of another apartment in which he had an interest after Rita had recovered money from under a mattress. When Rita confronted Ever with his failure to disclose the pres-

ence of the money, Ever responded that he did not live in the apartment but lived elsewhere. Ever, however, then attempted to mislead Rita into thinking he lived with Serna. When his deception appeared to prove unsuccessful, Ever finally agreed to lead Rita to search "his" apartment where Ever said he had documents proving his alien status. Although Rita did not find any such documentation, he found and seized evidence of narcotics activity. Moreover, it is noteworthy that Ever gave Rita his consent well past midnight, after the agents had been in or outside of the apartment for several hours. In addition, Ever was under arrest when his consent was given and it can be undoubtedly inferred that the presence of several agents in the apartment created a coercive atmosphere. Thus, this court concludes, based upon the totality of circumstances, that Ever's consent to search East 85th Street was the "product of duress or coercion, express or implied," *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2048 and that the evidence seized by Rita in the course of his search at this location cannot be introduced against Ever.

### E. *Statements*

Defendants Mejia, Serna and Ever move to suppress statements made by each of them to Rita during an interview on August 16th, prior to their arraignments, but subsequent to an interview with an Assistant United States Attorney. These defendants stated to the Assistant, after having been read their *Miranda* rights, that they neither wished to make any statements nor to answer any questions without the presence of counsel. Shortly thereafter, the Assistant United States Attorney ended the interview without having taken any statements. Within perhaps an hour, Rita again advised these defendants of their *Miranda* rights and then proceeded to question them. Each of them made statements to Rita, which they move to suppress.

■ *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) makes

clear "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1628. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination." *Id.* at 475, 86 S.Ct. at 1628; *see also Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *United States v. Collins,* 462 F.2d 801 (2d Cir. 1972) (en banc).

 Rita knew that the defendants had just met with an Assistant United States Attorney. Prior to commencing his interviews, Rita should have ascertained, or the Assistant should have advised him, that the defendants had expressed a desire to remain silent until their attorneys were present. Rita also knew that the defendants would be represented by counsel at the arraignment, yet during the period immediately prior to the appearance of counsel, sought information from the defendants. Furthermore, Rita testified that the interview took place somewhere between the United States Attorney's office and the Magistrate's courtroom and described the circumstances surrounding the interview as "hectic". These conditions do not bespeak an atmosphere where the "intentional relinquishment or abandonment of a known right or privilege" would take place. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In addition, it is not clear to this court what purpose Rita served at that point in the proceedings, and it is entirely possible that defendants were similarly confused. It is conceivable that the defendants believed that Rita's presence was related to immigration matters. The substance of his questions, however, dealt with the defendants' narcotics violations. Based upon the above facts, the court must find that defendants did not "voluntarily" change their minds with respect to having counsel present.

*Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) is not to the contrary. In *Michigan* the Supreme Court stated that the admissibility of the statements obtained after a person in custody has decided to remain silent depends upon "whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. at 326, quoting *Miranda v. Arizona, supra,* 384 U.S. at 474, 86 S.Ct. at 1627. The court held that the statements made by the suspects were admissible since the police stopped asking questions after the suspects decided to remain silent and only resumed the interrogation when the suspect was again advised of his *Miranda* rights. *Michigan v. Mosley,* however, is distinguishable in two important respects. First, the questioning by the officers in *Michigan* once it did resume, covered a different and unrelated crime than the prior questioning covered. Here, as this court has noted, both the Assistant United States Attorney and Rita interrogated the defendants regarding their narcotics activities. Second, the suspects in *Michigan* only asserted their right to remain silent, whereas defendants before this court asserted their right not to answer any questions before consulting with their attorney.

For the aforementioned reasons, the defendants' statements made to Rita must be suppressed.

### F. *Warrants*

Defendant Gomez raises several challenges to the validity of the warrants that authorized searches of his Bennett Avenue apartment, his two safety deposit boxes and the apartment at 230 West 75th Street.

 He first alleges that the affidavit submitted in support of the warrant to search 295 Bennett Avenue on August 15th contains false statements. In particular, defendant asserts that Palombo neglected to list items which had been seized in the protective search and that other statements are either false or exaggerated. The affidavit upon which the warrant was issued, concededly contains some inaccurate statements. The existence of a false statement in such an affidavit, however, does not automatically result in the suppression of the

evidence obtained. Instead, the defendant has the burden to establish that the statements were 1) knowingly and intentionally made or with reckless disregard for their truth, and 2) necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56, 172, 98 S.Ct. 2674, 2676–77, 2685, 57 L.Ed.2d 667 (1979). The court finds that the truthful statements in the affidavit, standing alone, establish probable cause. Furthermore, the affidavit was prepared in the heat of an emergency situation, and on the record before this court, it does not find that the false statements were knowingly or recklessly made.

Gomez next argues that Magistrate Bernikow could not issue a warrant from his home in the Eastern District which authorized a search in the Southern District. The court assumes that the basis of his claim is an overly rigid reading of Rule 41(a) of the Fed.R.Crim.Proc. which states: "A search warrant authorized by this rule may be issued by a federal magistrate . . . *within the district wherein the property sought is located*, upon request of a federal law enforcement officer or any attorney for the government." (emphasis added) In *United States v. Strother*, 578 F.2d 397 (D.C. Cir. 1978), the court interpreted the italicized portion "to make clear that the search warrant can only be operative in the territory in respect of which the issuing officer is clothed with judicial authority. It is not intended . . . to require that under all circumstances the physical acts involved in the issuance of a warrant be performed in that territory." *Id.* at 399. This court agrees with the interpretation of the District of Columbia Court and finds that Magistrate Bernikow had authority to issue the warrant from his home in the Eastern District.

Gomez also challenges the warrants to search the two safe deposit boxes on the grounds that the affidavits do not support a finding of probable cause. Both affiants, Shea and Palombo, attested to details of the arrests at Bennett Avenue, the subsequent warrant search and the recovery of keys later identified to be keys to safety deposit boxes in Gomez' name. In addition, the agents stated that they believed that the boxes were likely to contain evidence of narcotics trafficking based on their experiences in other narcotics investigations.

This court finds that the magistrates had sufficient facts before them on which to base the warrants. First, Gomez had already been arrested and items had been recovered which linked him with narcotics activity. Second, the agents had recovered some cash at the time of the arrest, and it was not unlikely that they would find additional cash in the safe deposit box. Although the warrant contained a broad description of the property that the agents could seize, "[its] language was tempered by the extremely confined area to be searched—one safe deposit box." *United States v. Dunloy*, 584 F.2d 6, 10 (2d Cir. 1978). These facts coupled with the consideration given to a determination of seasoned agents, *United States v. Price, supra*, 599 F.2d at 501, established probable cause.

Gomez' last argument is that the affidavit in support of the warrant that authorized the search of his apartment at 230 West 75th Street was stale. The affidavit of Shea set out in detail the basis for the belief that Gomez exercised control over the apartment prior to his arrest and that narcotics paraphernalia was likely to be found at the premises. Although the affidavit is dated September 25th, forty days after the arrest, it provides reasons for the affiant's belief that no one had been in the apartment since the arrest. This in turn establishes that there was probable cause to believe that any evidence of narcotics which had been in the apartment when Gomez was arrested would still be there. *Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932), cited by Gomez, is inapposite. In that case, a second warrant was issued after the first one expired, without any support for a finding that probable cause still existed.

In summary, this court denies the motion of Jorge Gomez to suppress evidence seized from 295 Bennett Avenue, 230 West 75th Street and the two safe deposit boxes. He

has no standing with respect to any other search. Ever Serna's motion to suppress the statement he gave to Investigator Rita and the evidence recovered from 243 West 99th Street and 440 East 85th Street is granted. He has no standing to move to suppress evidence from any other search. The court grants Irma-Mejia-Londono's motion to suppress the statement to Rita and denies all other relief.[7] She has no standing to contest the seizure at 243 West 99th Street. Henry Serna's motion to suppress the statement to Rita and to suppress evidence seized from 243 West 99th Street is granted; all other relief is denied.

SO ORDERED.

---

7. In their respective omnibus motions, Mejia and Serna contested the validity of the search warrant pursuant to which their apartment at 340 East 80th Street was searched. They did not specify the grounds for their objection, nor furnish any factual allegations in support thereof. Accordingly, that portion of the omnibus motion is denied as to each of them.